1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KIRBY McINERNEY LLP**
Robert J. Gralewski, Jr. (CSB #196410)
bgralewski@kmllp.com
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 398-4340

*Counsel for Plaintiff GIC Private Limited*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIC PRIVATE LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>QUALCOMM INCORPORATED,<br><br>Defendant. | Case No. **'18 CV 0463 LAB BGS**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

1

**TABLE OF CONTENTS**

2    GLOSSARY OF TERMS .......................................................................... ii

3    I.     INTRODUCTION ...........................................................................2

4    II.    JURISDICTION AND VENUE.......................................................11

5

6    III.   THE PARTIES .............................................................................12

7         A.   Plaintiff ...........................................................................12

8         B.   Defendant.........................................................................12

9    IV.   BACKGROUND ..........................................................................18

10        A.   Cellular Standards............................................................18

11        B.   The FRAND Commitment ...............................................22

12    V.    NATURE OF THE ACTION .........................................................27

13        A.   Qualcomm Makes the FRAND Commitment ..................27

14        B.   Qualcomm Becomes One of the Most Powerful Technology Companies in the World ...................................29

15

16        C.   Qualcomm Assures Investors That It Does Not Discriminate Against Competitors ...................................35

17        D.   Qualcomm Assures Investors That It Does Not Bundle Its Licensing and Chip-Sale Agreements ........................43

18

19        E.   Unknown to Investors During the Relevant Period, Qualcomm Refused to License Competitors and Bundled the Terms of Its License and Chip Agreements ................46

20

21            1.   KFTC: Qualcomm Refused to License Competitors...................46

22            2.   FTC: Qualcomm Refused to License Competitors and Bundled Licenses and Chipset Deals...........................................55

23

24            3.   Industry Participants: Qualcomm Refused to License Competitors and Bundled Licenses and Chipset Deals ...............58

25                a.   MediaTek ................................................58

26                b.   Motorola..................................................62

27

28                c.   Samsung ..................................................64

i

| | | | | | |
|---|---|---|---|---|---|
| | | | d. | Intel ........................................................... | 64 |
| | | | e. | Apple .......................................................... | 65 |
| | | | f. | Qualcomm .................................................. | 70 |
| | F. | Regulators and Investors Respond to Qualcomm's Anti-Competitive Conduct ........................................ | | | 72 |
| VI. | DEFENDANT'S FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................................................ | | | | 78 |
| | A. | False Statements in 2013 ........................................... | | | 79 |
| | | 1. | 2013 Form 10-Q Quarterly Reports ..................... | | 79 |
| | | 2. | 2013 Annual Meeting of Stockholders .................. | | 80 |
| | | 3. | 2013 Form 10-K Annual Report .......................... | | 81 |
| | | 4. | Q4 2013 Earnings Call ...................................... | | 83 |
| | | 5. | 2013 San Diego Union Tribune Article: Altman Interview | | 84 |
| | B. | False Statements in 2014 ........................................... | | | 85 |
| | | 1. | 2014 Form 10-Q Quarterly Reports ..................... | | 85 |
| | | 2. | 2014 PowerTalk Interview ................................. | | 86 |
| | | 3. | 2014 Form 10-K Annual Report .......................... | | 87 |
| | C. | False Statements in 2015 ........................................... | | | 89 |
| | | 1. | 2015 Form 10-Q Quarterly Reports ..................... | | 89 |
| | | 2. | 2015 Mollenkopf Presentation at SIEPR Economic Summit | | 90 |
| | | 3. | 2015 Form 10-K Annual Report .......................... | | 91 |
| | | 4. | Qualcomm November 17, 2015 Press Release ......... | | 93 |
| | D. | False Statements in 2016 ........................................... | | | 94 |
| | | 1. | 2016 Form 10-Q Quarterly Reports ..................... | | 94 |
| | | 2. | 2016 First Quarter Earnings Call ....................... | | 95 |

3.   May 28, 2016 Shanghai Forum ................................................... 96

4.   June 24, 2016 Rosenberg Interview ........................................... 97

5.   2016 Form 10-K Annual Report ................................................ 98

E.   False Statements in 2017 ..................................................... 100

1.   Qualcomm January 17, 2017 Press Release ............................ 100

VII.   ADDITIONAL SCIENTER ALLEGATIONS ............................................. 101

VIII. LOSS CAUSATION ...................................................................... 116

IX.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................. 130

X.   PRESUMPTION OF RELIANCE ...................................................... 131

XI.   CLAIM FOR RELIEF UNDER THE EXCHANGE ACT ........................... 132

COUNT I ............................................................................................... 132

For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
Promulgated Thereunder ................................................................... 132

XII.   PRAYER FOR RELIEF ................................................................ 135

XIII. JURY DEMAND ........................................................................ 135

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# GLOSSARY OF TERMS

| | |
|---|---|
| 2G | Second generation wireless telephone technology |
| 3G | Third generation wireless telephone technology |
| 4G | Fourth generation wireless telephone technology |
| ACT | Association for Competitive Technology |
| CDMA | Code-Division Multiple Access, a 2G standard capable of voice transmission |
| FTC | United States Federal Trade Commission |
| FRAND | Fair, Reasonable, and Non-Discriminatory, the terms on which holders of SEPs are required to license such patents |
| GSM | Global system for mobile communications, a 2G digital standard using time-based wireless (TDMA) that was adopted by the European Union |
| IP | Intellectual Property |
| IPR | Intellectual Property Rights |
| KFTC | Korea Fair Trade Commission |
| LTE | Long-Term Evolution, the leading 4G standard |
| OEM | Original Equipment Manufacturer |
| QCT | Qualcomm CDMA Technologies; a division of Qualcomm that supplies mobile chipsets |
| QTL | Qualcomm Technology Licensing; a division of Qualcomm that receives royalty payments from licensees of its patents |
| SEP | Standard-Essential Patent, patents that are part of a designated standard technology required to be licensed by the patent holder on FRAND terms |
| SEC | United States Securities and Exchange Commission |
| TDMA | Time Division Multiple Access, an alternative 2G standard |
| Taiwan FTC | Taiwan Fair Trade Commission |
| WCDMA | Wideband Code Division Multiple Access, a 3G standard based on CDMA capable of voice and data transmission |

ii

1      1.      Plaintiff GIC Private Limited ("Plaintiff" or "GIC"), by its undersigned

counsel, makes the following allegations upon personal knowledge as to its own acts

and upon information and belief as to all other matters.  Plaintiff's information and

belief is based on its counsel's ongoing investigation.  The investigation of counsel is

predicated upon, a review and analysis of, among other things:  (i) public filings with

the U.S. Securities and Exchange Commission ("SEC") by Qualcomm Incorporated

("Defendant," "Qualcomm," or the "Company"); (ii) documents and information

concerning Qualcomm's business practices made available through formal

investigations and enforcement proceedings, including by the U.S. Federal Trade

Commission ("FTC"), Korea Fair Trade Commission ("KFTC"), Taiwan Fair Trade

Commission ("Taiwan FTC"), and the European Commission ("EC"), and through

civil lawsuits against Qualcomm; (iii) research reports by securities and financial

analysts; (iv) transcripts of Qualcomm's conference calls with analysts and investors;

(v) Qualcomm's press releases and presentations; (vi) news and media reports in the

United States and relevant jurisdictions around the world concerning the Company

and other facts related to this action; and (vii) data reflecting the pricing of Qualcomm

common stock.  Plaintiff believes that substantial additional evidentiary support is

likely to exist for the allegations set forth herein after a reasonable opportunity for

discovery, including access to the materials that Qualcomm and third parties have

produced to the FTC, KFTC, and other government regulators, but not to Plaintiff.

1

2.    Plaintiff brings this action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against Qualcomm for Plaintiff's purchases of Qualcomm common stock made during the period between March 2, 2013 through January 20, 2017, inclusive (the "Relevant Period"), and was damaged thereby.

## I.    INTRODUCTION

3.    This action concerns Qualcomm's false representation that it licensed its standard-essential patents on a non-discriminatory basis to the entire cellular communications industry.  Rather than abide by that representation—one it made repeatedly to industry participants, standard-setting bodies, and investors—Qualcomm and its top executives decided instead to exploit the Company's position as the holder of the industry's standard-essential patents to suppress competition, drive its rivals out of business, and extract supra-competitive royalties.  To that end, in 2008, prior to the Relevant Period, Qualcomm and its top executives amended the Company's well-established licensing policies, began refusing to offer licenses to its standard-essential patents to competing chipmakers, and doled out royalty relief to mobile phone manufacturers that agreed to largely or exclusively purchase Qualcomm's chipsets.  These undisclosed, highly exclusionary practices succeeded: within just seven years of the undisclosed change in its licensing policy, Qualcomm's revenues from chipset sales tripled, rising by approximately $10 billion, and virtually all competition was defeated.

4.      But false representations, especially ones made to standard-setting bodies and industry participants for over a decade, have consequences.  Anti-competition regulators across three continents have recently charged or found Qualcomm liable for violating competition laws based on its blanket refusal to license its standard-essential patents to competitor chipmakers and other unfair and discriminatory conduct.  One of those regulators, the KFTC, recently levied a record fine approaching $1 billion and issued a detailed and damning order condemning Qualcomm's multi-year effort to eliminate competition.  And another regulator, the FTC, recently brought a similar enforcement action to enjoin Qualcomm's anti-competitive licensing model.  Qualcomm's investors, including Plaintiff here, have likewise suffered.  These revelations of Qualcomm's clear-cut anti-competitive practices dealt a swift and severe blow to the value of the Company's shares, causing Qualcomm's stock price to plummet 33% during the Relevant Period, erasing over $32 billion in shareholder value.

5.      Qualcomm went public in 1991 as a fledgling company with no profits, few customers, and sorely in need of a capital infusion. The Company's prospects improved dramatically in 1993, when Dr. Irwin Jacobs, the Company's then-Chairman and Chief Executive Officer ("CEO"), succeeded in convincing the titans of high technology to select Code-Division Multiple Access ("CDMA") as a cellular "standard."  A cellular standard function as a technical "language" that allows cellular devices and cellular networks to interact.  Without a common technical standard,

3

cellular networks would not function, as different brands of phones would be unable to operate with each other or the network infrastructure in between.

6.      Qualcomm held nearly all patents essential for anyone to use CDMA technology. If CDMA were accepted as the standard, all participants in the telecommunications industry—including mobile phone companies, equipment manufacturers, chipset makers, and network carriers—would need to use Qualcomm's patented technologies. Accordingly, if its CDMA were adopted, Qualcomm would be able to demand licenses to use its essential patents from industry participants, and thus profit handsomely.

7.      Participants in the wireless industry were understandably skittish about adopting CDMA as the standard.  They were concerned about what would happen if Qualcomm, after the adoption of CDMA and follow-on technologies, refused to license its essential patents to its competitors.  They were also worried that Qualcomm would insist on bundling the terms of its license agreements with the purchase of Qualcomm downstream products, such as the Company's chipsets, once the industry was "locked in" to the CDMA standard. To avoid these risks, industry participants required the Company and its executives to commit to the industry's standard-setting bodies that they would license Qualcomm's patents essential to the standard ("standard-essential patents" or "SEPs") to all companies on a "fair, reasonable, and non-discriminatory basis." Qualcomm and its executives made and reaffirmed this

4

commitment—known as the "FRAND" commitment—hundreds of times to the standard-setting bodies in written declarations and certifications.

8. Qualcomm's compliance with its commitment to the standard-setting bodies and industry participants was also critically important to investors because it greatly impacted the risk profile of an investment in the Company. Failure by Qualcomm to fulfill its commitment to license its standard-essential patents would result in enforcement actions and fines by regulators, as well as civil lawsuits for injunctions and money damages by industry participants. For this reason, Qualcomm and its executives affirmatively represented in reports filed with the SEC and in their public statements that they "committed to such standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis" and that the Company had complied with that commitment.

9. Qualcomm's executives bolstered these representations concerning the Company's commitment to license its standard-essential patents on a fair, reasonable, and non-discriminatory basis with further assurances during analyst calls, investor conferences, and press releases, including unequivocal statements such as "we've never refused to license," "we license broadly," we made our standard-essential patents "available to the industry," and we license so "the entire market could play." As Defendant acknowledged prior to the Relevant Period, "a decision that we are going to license you and not license you ... would be discriminatory" and "saying we refuse to license competitors is like saying McDonald's refuses to sell hamburgers ....

5

It's nuts. It's crazy!" These unequivocal assurances that Qualcomm was willing to license to anyone was held out as the "hallmark" of the Company's licensing model—or so Qualcomm and its top executives led investors to believe.

10.    In addition to licensing its patents, Qualcomm designs and sells "chipsets." These integrated semiconductor circuits, which are contained in virtually every cellular phone, function as a wireless controller or application processor for the device. Qualcomm began manufacturing chipsets for cellular phones in 1992. For the next fifteen years, Qualcomm faced robust competition from other chipset manufacturers, including Texas Instruments, MediaTek, Broadcom, Freescale, Infineon, Motorola, NEC, and STMicro, among others. These companies all produced chipsets that could perform virtually all of the digital functions of a cellular phone, and some of these companies produced chipsets that were considered, in terms of both price and quality, superior to Qualcomm's chipsets. In 2006, for example, Texas Instruments held a commanding 42% share of the wireless chipset market, with Qualcomm's market share hovering in the 18 to 20% range.

11.    Then, beginning in 2008, an unexpected shift occurred. Qualcomm's share of the chipset market spiked—along with its chipset revenues—and competitors were forced to exit the industry. In 2008, for example, Qualcomm saw its share of the chipset market nearly double to 37% from the year before. Over the next six years, Qualcomm's share of the global chipset market continued to climb, achieving a remarkable 66% share in 2014—two-thirds of the entire worldwide market.

And Qualcomm gained even more dominance over the market for CDMA chipsets, in which it commanded more than 90% of the market for each year between 2008 and 2014. As would be expected, as Qualcomm's share of the chipset market swelled, so too did the Company's revenues attributable to chipset sales. Between 2008 and 2014, Qualcomm's chipset revenues tripled, from $6.7 billion in 2008 to over $18.6 billion in 2014. Thus, in a matter of only a few years, Qualcomm went from one in a field of many competitors to *the* global powerhouse in the burgeoning market for mobile-phone chipsets.

12.     Unknown to investors during the Relevant Period, Qualcomm achieved dominance over the mobile chipset market by violating its commitment to standard-setting bodies and industry participants, by violating worldwide anti-competition laws, and by violating its affirmative representations to investors. Contrary to its public representations that the Company licensed its cellular technologies "broadly" on a "non-discriminatory" basis to the "entire industry," Qualcomm adopted a policy beginning in the 2008 timeframe of refusing to license its standard-essential patents to competitor chipset manufacturers. Without a license to these standard-essential patents, Qualcomm's rival chipmakers were doomed to fail. And that is precisely what happened: mobile phone manufacturers were loath to buy chipsets from unlicensed companies.   Accordingly, within a matter of a few years, nearly all of the leading chipset manufacturers exited the market, leaving Qualcomm with an iron grip over the entire global mobile telecommunications industry.

13.     Qualcomm's policy of refusing to license competitors has now been exposed. Major industry participants—including Intel, Samsung, Apple, and MediaTek, among others—have detailed how Qualcomm stifled competition by refusing to license its standard-essential patents to chipset manufacturers.   As explained by Mr. Wei-Fu Hsu, MediaTek's long-time chief legal officer, MediaTek "specifically demand[ed] patent license negotiations" during the Relevant Period, and "did raise this request for a license several times," but was repeatedly rebuffed by Qualcomm and its senior executives.   Qualcomm similarly blocked Samsung, Intel, Via Technologies, and other competitors from obtaining licenses to the necessary patents for the cellular standards.

14.     Regulators in the United States, Asia, and Europe have initiated enforcement actions against Qualcomm for violating fair competition and anti-monopoly laws by refusing to license competitors—and, in the case of the KFTC, found Qualcomm liable and fined it nearly a billion dollars. Confronted with the KFTC's evidence, Qualcomm ultimately admitted to having engaged in the fundamentally unfair and discriminatory practice of refusing to license its competitors for over the past nine years, which enabled its rise to dominance.

15.     In addition to misrepresenting its willingness to license to the entire industry, Qualcomm also falsely assured investors that the Company did not "bundle" the terms of its license and chipset agreements.   The commitment to license on fair and non-discriminatory terms obligates holders of standard-essential patents (such as

8

Qualcomm) to license its essential patents, regardless of whether licensees also agree to purchase the patent holder's downstream products (such as Qualcomm's chipsets). In this case, Qualcomm and its top officers not only committed to license on non-discriminatory terms—and, thus, not bundle—but they also affirmatively represented to investors that "we don't bundle." Indeed, during investor conference calls in the Relevant Period, Qualcomm's senior officers, including its current President and CEO, quieted investor concerns with specific representations that "<u>we don't bundle those together</u>" and "<u>we have been very clear that we keep those two things separate</u>."

16.    As investors have come to learn, however, Defendant's representations concerning the purported separation of the terms and negotiations of Qualcomm's licensing and chipset sales agreements were false, misleading, and omitted material facts. In January 2017, both the FTC and Qualcomm's largest customer, Apple, detailed in public filings how Qualcomm reinforced its grip on the mobile chipset industry by bundling the terms of its license agreements with chipset sales. Qualcomm gave handset manufacturers a clear avenue to obtain royalty relief on its licenses: buy only Qualcomm's chips. In the words of the FTC, "Qualcomm has offered customers incentive payments (often tied to their purchase of Qualcomm's processors [i.e., chipsets]) to induce those customers to accept Qualcomm's preferred license terms" in order to "'close the gap' with customers that resist license terms they regard as unreasonable."

9

17.   Qualcomm's practice of bundling the terms of its license and chipset sales agreements has been further confirmed by, among others, former high-level employees of the Company, its customers, and its competitors.   For example, Qualcomm's former Vice President of Technology explained that when making chipset agreements with customers, "there was always a QTL [license business] component that would act in the background."   A former senior member of Apple's Patent Licensing & Strategy department confirmed that Qualcomm provided royalty rebates tied to chipset purchases, explaining that "if you buy 'x' number of chips over so many years, Qualcomm will give you something else and that will offset what you have to pay for the license."   Mr. Hsu, MediaTek's general counsel, confirmed that he heard from multiple companies during the 2012 to 2013 timeframe, including Huawei, ZTE, and other handset manufacturers, that if a licensee wanted a royalty reduction they had to buy Qualcomm chipsets.

18.   When the truth was revealed about Qualcomm's refusal to license its competitors and the Company's bundling of licenses and chipset sales agreements, investors suffered greatly.   With each successive revelation of the Company's previously-hidden practices, the market harshly responded, causing the value of Qualcomm's shares to plummet and investors to incur billions of dollars in damages.

19.   Plaintiff purchased Qualcomm shares at artificially inflated prices during the Relevant Period.

20.     Plaintiff lost tens of millions of dollars as a result of the securities law violations alleged herein.

## II.   JURISDICTION AND VENUE

21.   This action arises under Sections 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b 5, promulgated under the Exchange Act.

22.   This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

23.   Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c).  At all relevant times, Qualcomm has conducted business in this District and has maintained its headquarters in this District at 5775 Morehouse Drive, San Diego, California.  In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

24.   In connection with the acts alleged herein, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of national securities exchanges.

III.   **THE PARTIES**

A.   **Plaintiff**

25.   GIC was incorporated in 1981 under the Singapore Companies Act and is wholly owned by the Government of Singapore.  GIC is headquartered in Singapore and has ten offices worldwide including one in New York and another in San Francisco, California.   During the Relevant Period, GIC purchased Qualcomm common shares at prices that were artificially inflated and suffered substantial damages as a result of the securities violations alleged herein.

B.   **Defendant**

26.   Defendant Qualcomm is a corporation organized under Delaware law and headquartered at 5775 Morehouse Drive, San Diego, California. Qualcomm holds patents essential to certain cellular communications standards.   Qualcomm has committed to standard-setting bodies to license those patents on a fair, reasonable, and non-discriminatory basis. Qualcomm has also become one of the world's largest chipset suppliers.   The Company's primary business segments are Qualcomm Technology Licensing ("QTL"), which receives royalty payments from its licensees of the cellular technologies, and Qualcomm CDMA Technologies ("QCT"), which supplies mobile chipsets.  These two business segments accounted for virtually all of the Company's revenues and profits during the Relevant Period.  Qualcomm's stock trades on the NASDAQ Stock Market under the symbol "QCOM."

27.    During the Relevant Period, Qualcomm acted through its various directors and officers including, among others:

28.    Derek K. Aberle ("Aberle") is Qualcomm's current President.  He has been President of Qualcomm since March 2014 and a member of Qualcomm's Executive Committee since 2008.  Aberle joined Qualcomm in December 2000 and held numerous executive-level positions at the Company prior to becoming its President.  These positions included: Executive Vice President and Group President from November 2011 to March 2014; President of QTL from September 2008 to November 2011; and Senior Vice President and General Manager of QTL from October 2006 to September 2008.  As acknowledged in the Company's March 10, 2014 press release, Aberle was "instrumental in creating and growing many important areas of Qualcomm's business over the past 13 years, including [its] licensing business."[1]   Aberle has further been described by the Company on its website as having, over the past decade, personally "played a leading role in structuring and negotiating key license agreements with Qualcomm's licensees."[2] During the Relevant Period, Aberle regularly spoke to investors and securities analysts regarding the Company and its licensing model, professing to know what he was speaking about. Aberle made certain of the misstatements and omissions alleged herein.

---

[1] Press Release, Qualcomm Inc., "Derek Aberle Named Qualcomm President" (Mar. 10, 2014).

[2] *Id*.

29.     Steven R. Altman ("Altman") was the President and Vice Chairman of Qualcomm and a member of its Executive Committee for over 15 years.  While at Qualcomm, Altman's roles included: Vice Chairman from November 2011 to January 2013; President of Qualcomm from July 2005 to November 2011; Executive Vice President from November 1997 to June 2005; President of QTL from September 1995 to April 2005; and General Counsel from October 1989 through September 2000.   As the Company stated in its press releases, Altman was the "chief architect of Qualcomm's IP licensing strategy" and was "responsible for structuring and negotiating key license agreements."[3]   Altman has stated publicly that he was "an active participant in essentially every major transaction in which the company has taken part."   During the Relevant Period, Altman regularly spoke to investors and securities analysts regarding the Company and its licensing model, professing to know what he was speaking about.  Altman made certain of the misstatements and omissions alleged herein.

30.     Donald J. Rosenberg ("Rosenberg") has been Executive Vice President, General Counsel and Corporate Secretary of Qualcomm Incorporated since October 2007.  Rosenberg reports directly to Qualcomm's CEO, Steven Mollenkopf, and is a member of Qualcomm's Executive Committee.   In his role as General Counsel,

---

[3]   Press Release, Qualcomm Inc., "Steve Altman, Qualcomm Vice Chairman, to Retire" (Oct. 16, 2013).

Rosenberg is responsible for overseeing Qualcomm's worldwide legal affairs, intellectual property and corporate matters. During the Relevant Period, Rosenberg regularly spoke to investors and securities analysts regarding the Company and its licensing model, professing to know what he was speaking about. Rosenberg made certain of the misstatements and omissions alleged herein.

31.    William F. Davidson, Jr. ("Davidson") joined Qualcomm in February 2002 and was Senior Vice President of Qualcomm's Strategy and Operations for Global Market Development for QTI from May 2013 to August 2014. Prior to that time, Davidson was Qualcomm's Senior Vice President of Investor Relations from April 2007 to August 2014, and Senior Vice President of Global Marketing from April 2007 to August 2012. During the Relevant Period, Davidson regularly spoke to investors and securities analysts regarding the Company and its licensing model, professing to know what he was speaking about. Davidson made certain of the misstatements and omissions alleged herein.

32.    Paul E. Jacobs ("Jacobs") is the Chairman of the Board of Directors of Qualcomm and has occupied that position since March 2009. In addition, Jacobs was the Company's Chief Executive Officer from July 2005 to March 2014. Before becoming CEO, Jacobs was the Executive Vice Group President of the Qualcomm Wireless & Internet Group from July 2001 to July 2005, and Executive Vice President from February 2000 to June 2005. As Qualcomm has acknowledged on its website,

15

Jacobs was "a key architect of Qualcomm's strategic vision."[4]   Jacobs signed and certified the Company's quarterly and annual SEC filings between 2012 and 2016. During the Relevant Period, Jacobs regularly spoke to investors and securities analysts regarding the Company and its licensing model, professing to know what he was speaking about.   Jacobs made certain of the misstatements and omissions alleged herein.

33.     Steven M. Mollenkopf ("Mollenkopf") is Qualcomm's Chief Executive Officer.   Mollenkopf has been Qualcomm's CEO since March 2014, a member of the Company's Board of Directors since December 2013, and a member of Qualcomm's Executive Committee since July 2008.   Mollenkopf first joined Qualcomm in 1994 and held numerous executive-level positions at the Company prior to becoming its CEO.   These positions included President and Chief Operating Officer ("COO") from November 2011 through December 2013; Executive Vice President and Group President from September 2010 to November 2011; Executive Vice President and President of QCT from August 2008 to September 2010; Executive Vice President of QCT Product Management from May 2008 to August 2008; Senior Vice President of Engineering and Product Management from July 2006 to May 2008; and Vice President of Engineering from April 2002 to July 2006. As CEO, Mollenkopf is

---

[4] Website biography, Qualcomm Inc., Leadership: Dr. Paul E. Jacobs, Executive Chairman and Chairman of the Board, https://www.qualcomm.com/company/about/leadership/paul-jacobs

responsible for overseeing Qualcomm's QCT division.  Prior to his promotion to CEO, Mollenkopf, by his own account, "led the Company's chipset business" at Qualcomm.[5]   In addition to running the chipset business, Mollenkopf also played a critical role in helping to "define and implement Qualcomm's strategy and technologies."[6]  Mollenkopf signed and certified the Company's quarterly and annual SEC filings from the second quarter of 2014 to the first quarter of 2017.  During the Relevant Period, Mollenkopf regularly spoke to investors and securities analysts regarding the Company and its licensing model, professing to know what he was speaking about.  Mollenkopf made certain of the misstatements and omissions alleged herein.

34.    In this Complaint, Aberle, Altman, Rosenberg, Davidson, Jacobs, and Mollenkopf are collectively referred to as the "Executive Officers."  The Executive Officers directly participated in the management of Qualcomm's operations, had the ability to control and did control Qualcomm's financial reporting, and were aware of confidential information concerning Qualcomm, its chipset business, and its licensing policies and negotiations.  They also were involved in drafting, reviewing, publishing,

---

[5] Website biography, Qualcomm Inc., Leadership: Steve Mollenkopf, Chief Executive Officer https://www.qualcomm.com/company/about/leadership/steve-mollenkopf

[6] *Id*.

17

and making the materially false and misleading statements and omissions alleged herein, and approved or ratified these misstatements or omissions.

## IV.   BACKGROUND

### A.   Cellular Standards

35.   Much like human conversation requires participants to agree on which language to speak, manufacturers and vendors in the cellular communications industry needed to agree on a common set of technical standards in order for cell phones, cellular infrastructure, and related communication technologies from different companies to function and operate.  Such common standards create the necessary technical "language" that allows mobile devices, cellular networks, and their component parts to communicate with one another.  Without a common technical standard, the cellular network simply could not function.

36.   To develop a common set of cellular communications standards, participants in the cellular industry formed standard-setting bodies.   A leading standard-setting body for the cellular communications industry is the European Telecommunications Standards Institute ("ETSI").  ETSI is composed of more than 800 members from countries across five continents, including manufacturers, network operators, service and content providers, national administrations, universities and research bodies, user organizations, and consultancy companies and partnerships.  ETSI has a global perspective, and its standards are accepted throughout the world, including in the United States. In addition to ETSI, other leading standard-

setting bodies for the telecommunications industry include the Telecommunications Industry Association ("TIA"), the Cellular Telecommunications Industry Association ("CTIA"), the American National Standards Institute ("ANSI"), and the Alliance for Telecommunications Industry Solutions ("ATIS").

37.   Virtually every participant in the development of communication technologies for the cellular industry is a member of one or more standard-setting bodies. Members include: (i) owners of patents underlying the standards, such as Nokia, Ericsson, and Qualcomm; (ii) chipset manufacturers, such as Intel, MediaTek, and Qualcomm, which make the baseband processor chipsets that enable cellular phones to communicate with a carrier's cellular network; (iii) handset manufacturers, such as Apple, Samsung, and LG, which make the cell phones used by consumers; and (iv) wireless carriers, such as AT&T, Verizon, Sprint, and T-Mobile, which operate the mobile wireless systems that allow users to place and receive telephone calls, and send and receive data on their cell phones.

38.   Professor Michael A. Carrier is a Distinguished Professor of Law at Rutgers University and an expert in antitrust and intellectual property matters.  He has written more than 90 articles and book chapters on antitrust and intellectual property laws.

39.   Professor Carrier's scholarship has been cited in opinions of the U.S. Supreme Court, California Supreme Court, D.C. Circuit, Second Circuit, Third Circuit, Fourth Circuit, district courts, International Trade Commission, and Federal

Trade Commission, as well as in congressional hearings, government officials' speeches, and congressional and government agency reports. Professor Carrier has testified before the U.S. Senate Judiciary Committee (Subcommittee on Antitrust, Competition Policy and Consumer Rights) and National Academies (Board on Science, Technology, and Economic Policy), and given talks to the Canadian Competition Bureau, U.S. Department of Justice, FTC, and state attorneys general. He is a member of the Board of Advisors of the American Antitrust Institute and is a past chair of the Executive Committee of the Antitrust and Economic Regulation section of the Association of American Law Schools (AALS). As Professor Carrier has explained in connection with this action:

> The standards process is vital for products like cellular devices to exist. Without such common 'rules of the road,' it is hard to see how the industry would survive. To put things more practically, without industry standards, your iPhone would not be able to connect to multiple wireless networks, play videos compressed with particular technologies, or even connect to numerous charging outlets.

40.    Cellular standards incorporate technology covered by patents owned by various holders. Such patents are known as "standard-essential patents" or SEPs.  All companies that seek to sell a product, service, or cell phone component that implements the cellular standard necessarily use the technology claimed in standard-essential patents.  As a corollary, a company using a standard must obtain a license from the holder of the standard-essential patents to avoid infringing the patent.  Without such a license to these essential patents, the company's products or services

would infringe, and the patent holder could bring an action to enjoin the infringing conduct or obtain an award of monetary damages. [7]

41.    For all of its benefits, standardization presents opportunities for abuse. Among other things, the holder of the standard-essential patents may  abuse its position by: (i) refusing to license its patents to competitors (thus blocking competitors from using the standard); (ii) insisting on licensing terms that discriminate in favor of the patent holder's own downstream products (thus inducing licensees to purchase downstream products, such as chipsets, that they otherwise would not purchase); or (iii) demanding supra-competitive license terms beyond the value of the patent (thus extracting benefits from its patents to which it is not entitled). The FTC has explained that "patent holdup" describes the potential that an "SEP holder can use the leverage it may acquire as a result of the standard-setting process to negotiate higher royalty rates or other favorable terms after the standard is adopted than it could have credibly demanded beforehand."  Professor Carrier has further explained that "'patent holdup' has appropriately received antitrust attention since it reflects an abuse of the process, allowing a patent-holder to take advantage of investments made in conformance with a standard that would be rendered worthless if the implementer were forced to switch to a new technology."

---

[7] Prepared Statement of the FTC Before the U.S. Sen. Jud. Comm. Concerning "Standard Essential Patent Disputes and Antitrust Law" (July 30, 2013), at 1.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B.      The FRAND Commitment

42.      To safeguard against potential abuses of standardization, standard-setting bodies require, before adopting a standard, that all members who believe they hold standard-essential patents first identify and "declare" such patents, and then commit to grant licenses to those patents on a "fair, reasonable, and non- discriminatory" basis.  This licensing commitment, referred to as the "FRAND" or "RAND" commitment, is a critical aspect of the standard-setting process.   If a holder of an essential patent refuses to make such a promise, the standard-setting body will pursue an alternative technology to include as part of the standard.  A patent holder that makes the FRAND commitment promises to license its standard-essential patents to anyone willing to accept a license and relinquishes its right to exclude a licensee from the standards-based technologies.

43.      The FRAND commitment is an important and necessary check on the patent holder's power to use its standard-essential patents to "holdup" implementers of the standard.  Without a FRAND commitment, holders of standard-essential patents would have an easy path to monopoly profits because, once the standard is adopted, the patent holder could refuse to license its essential patents, charge unreasonable or discriminatory terms, or bundle essential patents with other products, with all implementers of the standard having no choice but to use the patented standard and purchase the other products.  The FRAND commitment is therefore a critical tool in preventing exploitative and exclusionary practices, and in ensuring that

the standard remains accessible to all who wish to implement it.  In exchange for making a FRAND commitment, the holder of the standard-essential patent receives the opportunity to obtain a reasonable royalty, as well as the industry's widespread adoption of a standard incorporating its patents.

44.    As Professor Carrier further emphasized:

FRAND obligations are essential to the standard-setting process. 'Ex ante,' before a standard is selected, a patent holder lacks market power. If, at such a time, it stated that it would refuse to license its patent, charge excessive or discriminatory royalties, or force implementers to license additional, non-standard-essential patents or purchase unrelated products, the organizations would quickly drop such patented technology from consideration. For that reason, 'ex post,' after the standard has been adopted, and when the organization is locked into using the technology, a patent holder's attempts to engage in such behaviors constitute an abusive exercise of market power that threatens the standard-setting process, competitors, and consumers.

45.    Industry organizations have also emphasized the importance of the FRAND commitment.  For example, ACT, also known as the Association for Competitive Technology, is an industry group representing 5,000 small and mid-size cellular application developers and information technology firms.  As ACT has explained, "[b]ecause the FRAND promise is designed to address the competitive problems that can occur with industry collaboration during the standardization process, the violation of a FRAND promise presents not merely contractual issues, but also significant competition law concerns."

46.    After making a FRAND commitment, the holder of a standard-essential patent is entitled to seek only a fair, reasonable, and non-discriminatory royalty from

23

an implementer of the cellular standard.  The FRAND commitment includes three

basic components relevant to this matter:

      **a.**      **An obligation to license.**  A standard-essential patent holder that elects

to make a FRAND commitment is obligated to offer licenses to any entity that seeks a

license. Having made the commitment to license on FRAND terms, thereby inducing

others to adopt the standard, the holder of a standard-essential patent cannot then

renege on its commitment and decide not to license certain companies.  This has been

confirmed by courts in this Circuit and around the world.    The Ninth Circuit has

recognized that, after making a FRAND promise, a standard-essential patent holder

"cannot refuse a license to a manufacturer who commits to paying the RAND rate." [8]

As Professor Carrier explained, "a refusal to license, after having made the FRAND

commitment, is as fundamental a breach of the FRAND licensing promise as can be

envisioned."

      **b.**      **An obligation not to discriminate against competitors.**  Having made

a FRAND commitment, the holder of the standard-essential patent also cannot

discriminate when it licenses.  Such discrimination occurs when the patent holder

refuses to license certain categories of licensees (e.g., competitors).  The requirement

that a patent holder not discriminate in licensing helps to prevent standard-essential

patent holders from squeezing out their competitors.

---

[8] *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1031 (9th Cir. 2015).

24

**c.     An obligation to license standard-essential patents on their own, without requiring that a licensee pay for other "bundled" items or products.**  A holder of a standard-essential patent maintains a monopoly over the patent underlying the standard.  If unchecked, the holder of such a patent could exploit its monopoly by bundling a license to its FRAND-committed patent to the purchase of other products, which could allow it to charge above-FRAND royalty rates.  A standard-essential patent holder that links its license to an agreement concerning a separate product is said to have "bundled" those two items.

47.     As Professor Carrier explained, the above three "basic components" lie at the core of the FRAND obligation:

> *First*, a FRAND commitment signifies a promise to license, which is directly breached by a refusal to license. *Second*, an obligation of nondiscriminatory treatment ensures that all potential implementers can obtain a license on similar terms, with an standard-essential patent holder's ability to pick and choose who can receive licenses on varying terms violating such a promise. *Third*, a FRAND commitment is violated by forcing (through refusal "sticks" or rebate "carrots") potential implementers to purchase separate items, which could result in supra-competitive royalty rates and which threatens even more severe harms than attempts to obtain injunctions.

48.     Mr. Wei-Fu Hsu, who served as MediaTek's General Counsel between 2008 and 2016 and the head of its legal department for a dozen years (*see* description of Mr. Hsu at paragraph 100), likewise confirmed that "a basic component of the FRAND commitment is that a holder of a standard-essential patent must be prepared to offer a license to the patents, including competitors." Mr. Hsu explained that this

component of the FRAND obligation is extremely important because, when standard-setting organizations' members are choosing between proposals for competing technologies to be adopted as a standard, the groups rely on a member's commitment to license its patents, on FRAND terms, in exchange for their agreement to adopt the technology as a standard.

49.    Qualcomm itself has publicly acknowledged that the FRAND commitment requires holders of standard-essential patents, such as itself, to broadly license, including to competitors. As Rosenberg told the FTC on June 13, 2011, the "foundational goal" of the standard-setting organizations' FRAND policy "is availability of licenses necessary to practice standards" and "[c]ertainly, a patent-holder who gives a RAND commitment gives up the right to refuse to license."[9] Rosenberg has further acknowledged, when speaking to Qualcomm investors, that "a decision that we are going to license you and not license you … would be discriminatory."[10]

50.    Remarkably, as discussed further below, despite its recognition that a refusal to license its standard-essential patents to competitors would in fact be "discriminatory," Qualcomm secretly employed a policy which was exactly that.

---

[9] Comments of Qualcomm Incorporated to FTC Patent Standards Workshop, Project No. P11-1204 (June 13, 2011), at 26.

[10] Transcript, "Qualcomm Inc. at Friedman Billings Ramsey Capital Markets Investor Conference" (Dec. 1, 2009).

## V.    NATURE OF THE ACTION

### A.    Qualcomm Makes the FRAND Commitment

51.    Qualcomm holds patents essential to CDMA and certain follow-on cellular technologies.  Accordingly, beginning in 1985, Qualcomm advocated that cellular industry participants adopt CDMA and its follow-on technologies as the next cellular standards.  Because Qualcomm held CDMA-related patents, the Company would be able to collect significant licensing royalties if CDMA were adopted by standard-setting organizations and market participants as the next cellular standard.

52.    Qualcomm urged members of the standard-setting bodies during open forum meetings to adopt CDMA as a second generation ("2G") cellular standard.  The industry was initially reluctant to adopt CDMA as a standard, as many companies had already invested millions of dollars in technologies using a competing standard, Time Division Multiple Access ("TDMA").  In addition, industry members expressed reluctance to select CDMA as a standard because Qualcomm possessed near-total control over the patents underlying the CDMA technology.  Key critics of CDMA included Ericsson and SCS Mobilcom/Telecom (Interdigital), which submitted technical objections against Qualcomm's CDMA designs and asserted patent infringement claims against the Company.

53.    By 1993, Qualcomm persuaded many standard-setting bodies— including CTIA, TIA, and others—to adopt CDMA as a new 2G cellular standard. As part of its efforts, Qualcomm submitted individualized written declarations, some

of which were signed by Altman, stating that, for each CDMA patent it held, Qualcomm would "license [its] essential patents for these CDMA standards on a fair and reasonable basis free from unfair discrimination."

54.    After successfully urging the industry's adoption of CDMA as a 2G standard, Qualcomm promoted several follow-on standards for adoption as the third generation ("3G") and fourth generation ("4G") cellular standards.  In connection with successfully urging standard bodies to adopt Qualcomm's technologies, Qualcomm again committed and certified in writing that "we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis."   As a result of these repeated and specific assurances to standard-setting bodies, Qualcomm's technologies were adopted as 3G and 4G cellular standards throughout much of the developed world.

55.    Qualcomm has confirmed these facts to investors and reiterated its purported commitment to license on a "fair, reasonable and non-discriminatory basis."  As discussed more fully below, the Company's securities filings disseminated to investors specifically highlighted how Qualcomm had "informed [the standard-setting bodies] that we hold patents that might be essential" for the cellular standards and "committed to such standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis."   Qualcomm further assured investors that it, indeed, did offer licenses to interested companies on terms that are "fair, reasonable and non- discriminatory."

56.     As of the filing of this Complaint, Qualcomm declared over 30,000 global assets to be "essential" to the wireless standards and was thus obligated to grant licenses to these standard-essential patents on a fair, reasonable, and non-discriminatory basis to all potential licensees wishing to implement the standards.

**B.     Qualcomm Becomes One of the Most Powerful Technology Companies in the World**

57.     Qualcomm went public in 1991. The Company initially struggled to turn a profit. In its first full year as a public company, Qualcomm reported a $4 million loss. But as the Company's CDMA technologies were increasingly adopted as cellular standards, Qualcomm's licensing revenues climbed.

58.     As Qualcomm has acknowledged, the adoption of CDMA as a cellular standard "open[ed] the door to the global proliferation" of Qualcomm's digital wireless technology. CDMA's adoption as a standard propelled the Company's revenues, generated millions of dollars in high-margin royalties from those who wished to implement the CDMA standard, and caused the Company to realize immense profits. This is because, as the Company has acknowledged and publicly stated, after the adoption of CDMA and follow-on technologies, any company "seeking to develop, manufacture and/or sell products that use CDMA-based standards <u>will require a patent license from us</u>."[11] Accordingly, in the Company's first reported annual results after CDMA was adopted as a standard, Qualcomm

---

[11] Qualcomm Inc. 2012-2016 Forms 10-K.

29

recorded a profit of $12 million for fiscal 1993, after having posted a loss of $4 million the year before.

59.     In 1999, the selection of Qualcomm's CDMA and follow-on technology as part of the worldwide 3G cellular standard added new revenue streams for Qualcomm, and further entrenched the Company's dominant position in the industry. After the introduction of the 3G standard, the Company's licensing revenues nearly doubled, from approximately $404 million in fiscal 1999, to over $705 million in fiscal 2000, and Qualcomm's profits during that time more than tripled.

60.     By 2000, Qualcomm had been added to the S&P 500 and the Fortune 500 list, reflecting the Company's tremendous growth. Over the next decade-and- a-half, as cell phones and smart phones became ubiquitous, Qualcomm continued to grow its revenues by persuading additional standard-setting organizations to adopt its wireless technologies as standards.  This earned the Company praise as the "ATM of the wireless world" for its ability to generate a steady stream of profits in the form of licensing royalties paid for use of its standard-essential patents.[12]

61.     In addition to licensing its cellular technologies, Qualcomm derives a significant amount of revenue from the sale of chipsets.  Qualcomm began producing chipsets for cellular phones in 1992. Despite its initial success, Qualcomm was but one of many in a crowded field of chipset manufacturers.  During the first fifteen

_____

[12] Dave Mock, The Motley Fool, "Qualcomm: Cash Cow" (Nov. 6, 2003).

years that Qualcomm was in the chip business, the Company faced robust competition from companies located across the United States, Asia, and Europe. Qualcomm's chipset competitors included, for example, Texas Instruments, MediaTek, Broadcom, Freescale, Infineon, Motorola, NEC, and STMicro, among others. These companies all produced chipsets that were considered competent to perform virtually all of the digital functions of a cellular phone. And some of these companies produced chipsets that were considered superior to Qualcomm's chipsets, in terms of both price and quality.

62.   This vibrant global chipset market that existed between 1992 and 2007 provided many alternative options for manufacturers of cell phones and their component parts. The availability of numerous alternatives to Qualcomm chipsets created intense pricing pressures across the industry and razor thin margins. For example, in 2005, analysts at Rosetta Group noted that competitor chipset manufacturers, including Texas Instruments and Freescale, had produced "custom solutions" in 3G and WCDMA chipsets that were priced "well below" two-thirds the cost of Qualcomm chipsets.[13]   Thus, as of 2006, Texas Instruments held a commanding 42% share of the wireless chipset market, while Qualcomm's market share hovered in the 18 to 20% range that year and several years prior.

---

[13] Mona Eraiba, "Qualcomm: Broader Issues Than Inventories" (Apr. 24, 2005).

63. Beginning in 2008, however, a shift occurred, as Qualcomm's share of the chipset market spiked. In 2008, Qualcomm saw its share of the chipset market nearly double from the year before to 37%. In 2009, analysts at Collins Stewart applauded Qualcomm's "commanding" place in the cellular chipset market, noting that "Qualcomm's technology and commanding market position bodes well for its financial performance in 2010 and beyond."[14] Qualcomm's share of the global cellular chipset market continued to climb, achieving a remarkable 66% share in 2014—two-thirds of the entire worldwide market.

64. Qualcomm attributed its extraordinary success during this period to, among other things, its personnel, innovative technologies, and strategic partnerships. For example, during an analyst conference call on January 2, 2008, Jacobs claimed that the Company was able to consistently perform "extremely well" in a challenging environment, stating "[t]hat's really attribute[d] to our employees' focus, perseverance and dedication." Five years later, at a May 3, 2013 presentation at Stanford Business School on Qualcomm's leadership and vision, Jacobs underscored the Company's "fundamental values" of "innovation, execution, and partnership." Jacobs claimed that Qualcomm was able to secure a "leadership position" in the chipset industry by identifying strategic opportunities with companies both large and small "that will take the newest technology and bring it into the market, drive it very

---

[14] Ashok Kumar, "QCOM positioned for long term growth" (Jan. 7, 2009).

hard and then get everyone else to follow." Qualcomm dismissed as "jealousy" any suggestion that its success was due to factors other than the Company's superior personnel, technology, and strategic vision. As Jacobs commented during an analyst conference on November 19, 2014, "when you're successful, there is a lot of scrutiny" whipped up "by competitors who obviously don't like the fact that you're so successful." [15]

65.    As Qualcomm's share of the modem chipset market surged, so too did its revenues from licenses and patent royalties. In just a few years after 2008, Qualcomm became *the* global powerhouse in the mobile chipset market, with chipset revenues of over $12 billion and total revenues approaching $20 billion. By 2012, Qualcomm was the world's third biggest semiconductor supplier among all suppliers, not just mobile companies. Market research firm IHS noted that Qualcomm's meteoric ascent represented "the biggest increase of any major semiconductor supplier in recent history."[16]  Once Qualcomm's cellular technologies were adopted as industry standards and the Company generated billions of dollars in revenues attributable to licensing, royalties, and chip-sales, Qualcomm's market share and stock price soared, with the Company reaching a market capitalization of more than $137 billion in 2014.

---

[15] Transcript, "Qualcomm Inc. 2014 Analyst Meeting" (Nov. 19, 2014).

[16] Jeff Defilippi, ARM Blogs, "Qualcomm Rides Wireless Wave to Take Third Place in Global Semiconductor Market in 2012" (Dec. 4, 2012).

66.    Remarkably, although the size of the modem chipset market has  more than doubled since 2008, virtually all of Qualcomm's competing chipset manufacturers exited the market. As reflected in the below chart, between 2008 and 2015, nine of the eleven largest chipset manufacturers left the market.  NXP, Texas Instruments, and Freescale exited in 2008; NEC, Broadcom, and Ericsson each exited in 2014; and Nvidia and Marvell both left the market  in  2015.  And, meanwhile, not a single significant chipset manufacturer has entered the market since 2008. As a direct result of these companies exiting the industry, Qualcomm's chipset revenues increased dramatically, as reflected in the below chart.



34

67.     Unknown to investors at the time, and as discussed further below (*see* paragraph 195), Qualcomm achieved and maintained its dominance over competing chipset manufacturers by amending its licensing policy beginning in 2008. Thereafter, the Company implemented a policy of refusing to license its standard-essential patents to any competing chipset manufacturer, which made it unworkable for other chipset makers to meaningfully compete.  To further stifle any competition, Qualcomm bundled the terms of its license and chipset agreements, providing handset manufacturers with royalty relief only if they largely or exclusively purchased Qualcomm chipsets. These practices—which forced Qualcomm's competitors out of business and yielded billions in chipset revenues for Qualcomm—have recently been exposed and resulted in massive regulatory fines, enforcement actions, and investor losses.

### C.     Qualcomm Assures Investors That It Does Not Discriminate Against Competitors

68.     Not only did Defendant assure the telecommunications industry and the standard-setting bodies that it complied with its FRAND commitment, but they also made the same representations to investors.  In addition, Defendant further represented to investors that it "broadly licensed" its standard-essential patents to "everybody," were "pro-competitive," and did not "discriminate."  These assurances were made on numerous occasions, in myriad investor presentations, and by each of the Executive Officers.

35

69.     Both before and during the Relevant Period, the Executive Officers told investors that the Company licensed on a "non-discriminatory basis," with licenses to standard-essential patents offered to any company, including chipset manufacturers. For example, in the lead-up to the Relevant Period, Altman stated during investor presentations that "[w]e have never refused to license our essential patent to any company to supply chips" and "we have never refused to license our WCDMA essential patents to any company."  Davidson likewise told investors that "[w]e will license anyone who wants to go and have a license in CDMA," which supposedly was "the hallmark of that licensing program."  He emphasized at a later investor conference that "we don't shut anybody out" and "[w]e'll license anyone who is willing to enter in to the terms of our agreement." And Qualcomm specifically emphasized in its annual reports filed with the SEC and signed by Jacobs in the build-up to the Relevant Period that:

- "We license our CDMA intellectual property to the competitors of our QCT segment to support the deployment of CDMA-based systems";
- "[W]e have made licenses to our essential CDMA patents available to competitors of our QCT segment"; and
- "As part of our strategy to generate licensing revenues and support worldwide adoption of our CDMA technology, we license to other companies, including the competitors of our QCT segment."

70.     During multiple investor presentations prior to the Relevant Period, Qualcomm's top executives further represented how they had "made a decision and

36

made it very early that Qualcomm would be in the business of licensing and enabling as many companies as possible to produce products under its patent portfolio," with its licensees including "[o]ther chip manufacturers that do compete with Qualcomm in the chip market for wireless telephones." [17]

71.    Defendant expressly acknowledged that a refusal to license to competitor chip manufacturers would violate the Company's stated commitment to license on a non-discriminatory basis.  For example, Rosenberg told the FTC that once a patent holder (such as Qualcomm) commits to license on a fair, reasonable, and non-discriminatory basis, it "gives up the right to refuse to license."[18]

72.    Davidson acknowledged the same when he assured investors prior to the Relevant Period that "[w]e don't make a decision that we are going to license you and not license you because that would be discriminatory."[19]

73.    Qualcomm and the Executive Officers have acknowledged their awareness of the Company's licensing and business model.  For example, Altman, the Company's long-time President and head of its licensing unit for a half decade, was

_____

[17] Transcript, "Qualcomm Inc. Licensing/IPR Overview Conference Call & Webcast" (June 21, 2006).

[18] Donald Rosenberg, Comments of Qualcomm Inc. to FTC Patent Standards Workshop (June 13, 2011).

[19] Transcript, "Qualcomm Inc. at Friedman Billings Ramsey Capital Markets Investor Conference" (Dec. 1, 2009).

recognized by Qualcomm as the "chief architect of the Company's licensing business model." Altman, by his own account, was "an active participant in essentially every major transaction in which the company has taken part."[20] Aberle, who succeeded Altman as the head of Qualcomm's licensing group, was similarly recognized by the Company as having, "[f]or well over a decade, play[ed] a leading role in structuring and negotiating key license agreements with Qualcomm's licensees."[21] Rosenberg was also deeply immersed in the Company's negotiations with licensees and chipset manufacturers and has acknowledged his role in the Company's negotiations, stating that "[w]e try to negotiate all the time. That's what we do."[22] And for their parts, Mollenkopf and Jacobs, the Company's current and former CEO, respectively, each signed Qualcomm's SEC filings during the Relevant Period that purported to describe the Company's licensing policies. They also frequently met with regulators and appeared before regulatory bodies to discuss Qualcomm's licensing model and made repeated, specific assurances to investors and analysts on the subject.

74.     Defendant continued to tell investors during the Relevant Period that Qualcomm licensed its standard-essential patents to any company and on a non-

---

[20] Press Release, "Qualcomm Announces Leadership Change and Promotions" (Oct. 4, 2011); Transcript, "Qualcomm Inc. Stockholders Meeting" (Mar. 8, 2005).

[21] Website biography, Qualcomm Inc., Leadership: Derek K. Aberle, President, https://www.qualcomm.com/company/about/leadership/derek-aberle.

[22] Transcript, "Qualcomm Inc. Annual Shareholders Meeting" (Mar. 8, 2016).

discriminatory basis. For example, in its annual reports filed with the SEC and disseminated to investors in late 2012 and 2013, Qualcomm represented that it licensed its standard-essential patents to all "interested companies on terms that are fair, reasonable and non-discriminatory." Defendant echoed these representations during investor conferences, interviews, and press releases, assuring investors that Qualcomm continued to operate its licensing model consistent with how "we have done that for 30 years"—namely, licensing to all companies and on a basis that was "fair, reasonable and non-discriminate." [23]

75.    Defendant bolstered these representations when touting the Company's "licensing program," which purportedly "broadly licensed" to all industry participants and was "pro-competitive." Each of Qualcomm's quarterly reports filed with the SEC stressed that the Company's licensing model "promot[ed] a highly competitive ... wireless industry" and "enabl[ed] new, highly cost-effective competitors to their products." Defendant made yet additional representations during Relevant Period interviews and investor conferences that further led investors to believe Qualcomm licensed its standard-essential patents to all industry players on a non-discriminatory basis. For example:

---

[23] Lisa Wang, Taipei Times, "Qualcomm defends licensing fees" June 24, 2016).

1  •  Altman, when questioned about how "this licensing model has worked,"
2     responded that Qualcomm made its patents "<u>available to the industry</u> through
3     our licensing program";[24]
4  •  Aberle told investors that, "when you think about Qualcomm … once we solve
5     [technological problems], we don't keep the technology to ourselves: our
6     business model is to share that technology through licensing";[25]
7  •  Rosenberg assured investors during the Relevant Period that "Qualcomm's
8     business model – broadly licensing our technology and investing in R&D – is
9     enabling the success of many other companies in the wireless value chain";[26]
10 •  Jacobs, when he spoke to investors, similarly highlighted that "one of the
11    things that we've really focused on was making sure that we license broadly";[27]
12 •  Davidson, in his public interviews, also touted Qualcomm's purported "broad"
13    licensing program, stating that Qualcomm "created this unique business model
14    of not holding our patents to ourselves to advantage our own products, but
15    creating a product of them and broadly licensing them on a pro-active basis";[28]
16    and

---

[24] Mike Freeman, San Diego Union Tribune, "Qualcomm's Altman talks technology licensing" (Nov. 22, 2013).

[25] 2016 Shanghai Forum – Keynote Speech (Dec. 6, 2016).

[26] Intan Hamdan-Livramento, WIPO, "The Evolution of Technology Markets: Separating Fact from Fiction" (Apr. 2012).

[27] Transcript, "Qualcomm Annual Shareholder Meeting" (Mar. 5, 2013).

[28] Power Talk, "The Current State and Future of Mobile with Qualcomm's Bill Davidson" (Feb. 18, 2017).

- Mollenkopf further assured investors that "we figured out that the right business model was to actually focus on licensing the inventions, essentially through the standards bodies so that the <u>entire market could play</u>."[29]

76.     Remarkably, Defendant continued to assure investors that it maintained its "pro-competitive" model of "broadly licensing" to the entire industry even <u>after</u> regulators raised concerns that Qualcomm was, in reality, refusing to offer licenses to competitors.  For example, on November 17, 2015, Qualcomm issued a press release in response to the KFTC Case Examiner's Report, which stated that Qualcomm suppressed market competition by excluding competitors.   In its press release, Qualcomm quieted investors' concerns about the Case Examiner's Report with assurances that "the allegations and conclusions contained in the [KFTC Report] are not supported by the facts," further stating that Qualcomm's "patent licensing practices, which we and other patent owners have maintained for almost two decades [are] pro-competitive."   Again, on January 17, 2017, immediately after the FTC levelled its enforcement action, Qualcomm shot back with a press release in which Rosenberg assured the investing market that, contrary to the FTC's assertions, Qualcomm engaged in "broad-based licensing of [its standard- essential patents] on fair, reasonable and non-discriminatory terms."   The market trusted Defendant's repeated representations during the Relevant Period and highlighted Qualcomm's

---

[29] Burns and Mollenkopf at the 12th SIEPR Economic Summit (Mar. 17, 2015).

"licensing model"—including its willingness to license to competitors—as a reason to buy its stock.  For example, *Forbes*, in a March 23, 2012 article on Qualcomm, emphasized how Qualcomm "also licenses out its 3G technology <u>to other chipset manufacturers</u> that wish to sell CDMA-based chipsets to mobile manufacturers." Analysts at *Barron's*, in their November 25, 2013 report on Qualcomm, also emphasized how the Company, "[i]n addition to manufacturing its own chips, licenses its technology <u>to other chipmakers</u>, which provides a lucrative royalty stream." Analysts at *Trefis*, in their September 27, 2013 report on Qualcomm, similarly noted how "Qualcomm licenses CDMA technology <u>to other chipset manufacturers</u> that wish to sell CDMA-based chipsets to mobile manufacturers."[30] Likewise, *Forbes*, in its November 6, 2014 article on the Company, lauded Qualcomm's stock as a "big winner" and explained how the Company did not keep its standard-essential patents to itself, but rather "licens[ed] this technology to <u>other chip makers</u>."[31]  Accordingly, when suggestions arose that the Company might not license to competitors, analysts, including BMO Capital Markets, found that the allegations "<u>don't make sense</u>," as

[30] *See also, e.g.*, International Teletimes, "Qualcomm's got the mobile device market nailed" ("Qualcomm also licenses out its 3G technology to other chipset manufacturers that wish to sell CDMA-based chipsets to mobile manufacturers") (Jan. 23, 2012).

[31] Forbes, "Is Qualcomm's Business Model and Stock at Risk?" (Nov. 6, 2014).

42

1
2

Qualcomm supposedly does not "decline[] to issue licenses to chipset suppliers" and does not "prohibit[] these deals" with competitor chipmakers.[32]

3
4
5

**D.    Qualcomm Assures Investors That It Does Not Bundle Its Licensing and Chip-Sale Agreements**

6
7
8
9
10
11
12

77.    Qualcomm also told investors that it kept the negotiations and terms of its license and chipset agreements separate—i.e., that it did not "bundle." These representations were critical to investors because, as discussed above at paragraphs 46-47, bundling the terms of its agreements violated Qualcomm's commitment to the standard-setting bodies to license on a fair, reasonable, and non- discriminatory basis, and exposed the Company to regulatory actions and civil litigation.

13
14
15
16
17
18
19
20
21
22
23
24
25

78.    For years, investors sought assurances from Qualcomm and its senior management that the Company did not engage in the practice of bundling, but rather that it kept separate the terms of its license and chipset agreements. For example, in an earnings conference call prior to the Relevant Period, a J.P. Morgan analyst asked Altman whether, "in all of your royalties … and your agreements that you sign with everyone, are they all pretty much done at hand's length from QCT [i.e., the Company's chip business] irrespective of whether they [i.e., the licensees] actually purchas[e] chips from you."  On this subject, Altman represented that—consistent with the Company's commitment to the standard-setting bodies— the Company's

26
27

[32] BMO Capital Markets, "Qualcomm: More Detail on China IPR Issues" (Aug.14, 2014).

28

license agreements "<u>absolutely [] are done without QCT's [i.e., the chipset division's]</u> <u>involvement.  It's a QTL business unit [i.e., the licensing division] that is responsible</u> <u>for that</u>."[33]

79.    Throughout the Relevant Period, Defendant continued to represent to investors that it did not bundle the negotiations and terms of its license and chipset agreements, as any such bundling would violate its commitment to license on a fair and non-discriminatory basis.  For example, on November 27, 2012, Aberle spoke at the Credit Suisse Technology Conference in Scottsdale, Arizona, during which he specifically reassured investors:

> And within the Company, <u>we tend to keep the licensing and the chip</u> <u>business very separate</u>. Obviously, our view is that companies need a license if they are doing 3G or 4G devices, sort of irrespective of whose chip they use. And we try to keep that separated from whether they are using a QRD or a Qualcomm chip, and <u>we don't bundle those together</u>.

80.    A few months later, Qualcomm's executives once again unequivocally stated to investors that the Company did not bundle the terms or negotiations of its license and chip agreements.  Specifically, on February 25, 2013, Mollenkopf, Aberle, and Jacobs made an investor presentation at the GSM Association Mobile World Congress.  When questioned by an analyst about the Company's chip and licensing businesses, Mollenkopf responded: "Well, they are really separate

---

[33] Transcript, "Q3 FY 2005 Qualcomm Inc. Earnings Conference Call" (July 20, 2005).

44

businesses. I mean we have been very clear that <u>we keep those two things separate – separate propositions to the customer</u>.  So, really <u>two different things</u>."

81.    Analysts and investors took comfort in these representations. Accordingly, when rumors developed that Qualcomm might be bundling the terms of its license and chip agreements, analysts likewise dismissed these rumors as fiction.  On August 14, 2014, for example, BMO Capital Markets issued an analyst report that concluded that, in light of the Company's years of assurances, "<u>[w]e do not believe that QCOM bundles chip-sales with patent deals</u>," and adding that Qualcomm has "operated its two businesses independently, as we understand it."[34] In a later report, the same analysts echoed that, based on the Company's representations, "<u>[w]e do not think the company engages in this anticompetitive practice [of bundling]</u>."[35]

82.    But as analysts and investors would ultimately learn, they did not "understand it" correctly: Defendant's assurances that the it did not bundle were untrue, misleading, and omitted material facts. Government regulators and others have exposed that Qualcomm did, in fact, bundle the negotiations and terms of its license and chipset agreements.   Specifically, as discussed further below, the

_____

[34] BMO Capital Markets, "Qualcomm:    More Detail on China IPR Issues" (Aug. 14, 2014).

[35] BMO Capital Markets, "Qualcomm:    Does a Split Make Sense? Outlook and Model Before the Call" (July 21, 2015).

Company provided extensive royalty relief to handset manufacturers, including its largest customer Apple, if they agreed to purchase all or most of their chipsets from Qualcomm—and not a competitor.

> **E.    Unknown to Investors During the Relevant Period, Qualcomm Refused to License Competitors and Bundled the Terms of Its License and Chip Agreements**

83.    The KFTC found, and Qualcomm has now admitted, that the Company and its executives refused to offer licenses to their standard-essential patents to competitor chipset manufacturers. It has also been revealed that Qualcomm, contrary to its Relevant Period representations, bundled the terms and negotiations of its standard-essential patent licenses with its chipset agreements.  These undisclosed practices, which contradicted Qualcomm's express public statements to investors, have been confirmed through numerous sources, including regulators and industry participants, and have resulted in a regulatory fine of nearly $1 billion and multiple, ongoing enforcement actions and regulatory investigations across the globe.

> **1.    KFTC: Qualcomm Refused to License Competitors**

84.    Beginning in August 2014, the KFTC conducted a non-public investigation into allegations of anti-competitive conduct by Qualcomm.   The KFTC is held in high regard for its antitrust enforcement investigations.  For example, the Department of Justice ("DOJ") has publicly praised KFTC for having "done an outstanding job in becoming a leader in the promotion of sound competition law and

policy, not only in Asia, but throughout the world."[36]  The DOJ has further recognized that the "KFTC has shown itself to be a valued partner in efforts to strengthen international cooperation in the competition area," and explained that the "U.S.-Korea bilateral antitrust relationship is a strong one, based on a firm tradition of cooperation on both enforcement and policy matters."[37]   And in September 2015, the DOJ and FTC highlighted "the day-to-day working relationship we already enjoy with the KFTC" and entered into an agreement of cooperation reflecting the FTC's "interest in continuing and strengthening [its] relationship [with the KFTC] in the years to come."[38]

85.   The KFTC's investigation of Qualcomm's anti-competitive practices included on-site visits, review of electronic and hard-copy files, as well as written surveys and interviews of relevant witnesses and experts. In conducting its investigation, the KFTC adhered to the strict criteria set forth in its Guidelines, including the requirement that "[t]he concerned parties are given opportunities to fully voice their opinions." Among other things, the KFTC held seven full-

---

[36] The Korean Fair Trade Comm'n and the Int'l Competition Network, 2004 WL 5267573 (Apr. 20, 2014).

[37] *Id.*

[38] FTC Press Release, "Federal Trade Commission and Department of Justice Sign Antitrust Memorandum of Understanding with Korea Fair Trade Commission" (Sept. 8, 2015).

commission hearings in connection with the Qualcomm investigation. Industry participants from across the globe participated in the commission hearings, including Qualcomm (US), Apple (US), Ericsson (Sweden), Huawei (China), Intel (US), LG (Korea), Nvidia (US), MediaTek (Taiwan), and Samsung (Korea).

86.     After completing its thorough investigation, the KFTC issued a Case Examiner's Report that contained more than 400 pages of investigatory findings and exceeded 3,200 pages including annexes. The Case Examiner's Report found that Qualcomm suppressed market competition by excluding competitors. The KFTC provided Qualcomm with the Examiner's Report on November 17, 2015 and gave the Company nearly fourteen months to review and respond to the KFTC's initial findings, which it did during numerous non-public hearings.

87.     On January 20, 2017, the KFTC issued its 146-page Final Decision and Order and a summary of its Order. [39]   The KFTC's primary finding was that, "[n]otwithstanding requests from rival modem chipset makers, Qualcomm r e f u s e d or restricted the licensing of mobile communications SEPs (Standard-Essential Patents) that are essential in manufacturing and selling the chipsets in market." [40]

---

[39] KFTC Final Decision and Order, Decision No. 2017-0-25 (Jan. 20, 2017). All quotations of the Final Decision contained herein, which originally appeared in Korean, were translated by certified professional translators.

[40] Korea Fair Trade Commission, "KFTC imposes sanctions against Qualcomm's abuse of SEPs of mobile communications" (Dec. 28, 2016), at 1.

48

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

88.    As Professor Carrier has explained, the KFTC deliberation process was extremely thorough: "[t]he KFTC issued a comprehensive and thoughtful 146-page opinion that cited legal opinions and enforcement actions from the U.S. and Europe and that resulted from a thorough investigation that included seven full-commission oral hearings and cooperation from industry participants in Korea (Samsung and LG) and around the world (Apple, Intel, Nvidia, MediaTek, Huawei)."

89.    As detailed in the KFTC's Final Decision and Order, Qualcomm historically executed license agreements to its standard-essential patents to competitor chipset manufacturers. By 2008, however, the Company "established a business policy [that] amend[ed] [its] licensing policy." After 2008, Qualcomm "refused to execute license agreements with competing modem chipset manufacturers even if they requested the licensing of cellular standard-essential patents that are essential for the manufacture, sale, and use of modem chipsets." Confronted with the KFTC's evidence, Qualcomm "admitted" that it, indeed, had changed its licensing policies by 2008 and refused to license competing chipset manufacturers throughout the Relevant Period.

90.    In its Decision and Order, the KFTC documented many specific instances in which Qualcomm refused to offer a license to rival chipset manufacturers.  The specific examples identified by KFTC, and the underlying facts, include the following:

49

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(a)     MediaTek is a manufacturer of chipsets, whose ability to compete has been severely undermined by Qualcomm's refusal to offer chipmakers license to the Company's standard-essential patents. [41]   In 2008, MediaTek requested that Qualcomm enter into a licensing agreement for Qualcomm's standard-essential patents relating to the WCDMA technologies.   Qualcomm refused to make such an offer, and MediaTek was forced to accept, instead, a non-license arrangement. MediaTek soon discovered, however, that it "was impossible to fairly compete" without an actual license to Qualcomm's patents essential to the WCDMA technologies.

(b)     Unable to compete without a license, MediaTek made "repeated requests" to Qualcomm in 2012 that it offer MediaTek a license agreement to its standard-essential patents. Qualcomm "again refused."  In late 2012, MediaTek sent a letter to Qualcomm that cited the "unfair terms and conditions" in the parties' non-license arrangement and requested that the parties "enter into a license agreement under which [MediaTek] would pay royalties."  Five months later, in early 2013, Qualcomm

---

[41] MediaTek has been identified as "Company A" in the 2017 KFTC Final Decision. As with "Company A," MediaTek (i) was one of only a small number of companies in the 2G GSM chip business prior to 2008; (ii) began 3G GSM operations in 2009-2010; (iii) entered into a non-license arrangement with Qualcomm in 2009; and (iv) amended its agreement with Qualcomm in 2013.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Vice President and Legal Counsel, Fabian Gonell, responded that Qualcomm "did not agree to enter into any license agreement with [Mediatek]."

(c)     MediaTek again tried to obtain a license from Qualcomm in 2013, writing to Qualcomm and noting "the failure of [Qualcomm] to respond to [MediaTek]'s request to propose licensing terms and conditions and FRAND royalties" and "repeat[ing] its request [that Qualcomm] propose royalty rates and licensing terms and conditions." In its response, Qualcomm "repeatedly refus[ed] [MediaTek's] request to propose specific licensing terms and conditions and royalty rates," prompting MediaTek to write Qualcomm again to remind it "that [it] must enter into license agreements with those who have agreed to the FRAND terms with respect to standard-essential patents." MediaTek again specifically requested that Qualcomm "propose FRAND licensing terms and conditions." However, Qualcomm again responded that it had "no duty to grant a license" and would not negotiate a license agreement with MediaTek.

(d)     Samsung also attempted to manufacture chipsets for sale but was thwarted in its attempt by Qualcomm's refusal to license its standard-essential patents to chipset manufacturers. [42]   On or about June 29, 2011, Samsung requested that

---

[42] Samsung has been identified as "Company B" in the 2017 KFTC Final Decision. As with "Company B," Samsung (i) is the only company that operates as both an OEM and a chipset manufacturer; and (ii) entered into a licensing agreement in 1993 with Qualcomm that blocked Samsung from selling to other OEMs.

Qualcomm offer it a license to the Company's essential patents. Qualcomm refused Samsung's request, "without any room for negotiations." Samsung soon recognized, however, that it was critical to obtain a license agreement from Qualcomm in order to maintain a "business [in] modem chipset sales."  Indeed, when Samsung's modem chipset business division attempted to contact handset manufacturers to promote the sale of its chipsets, the handset manufacturers were reluctant to buy Samsung's chipsets because it had not obtained a license from Qualcomm to the essential patents. Accordingly, in 2012, Samsung again requested from Qualcomm a license to the standard-essential patents, but that request was similarly rejected. Due to Samsung's inability to obtain a license to the standard- essential patents, Samsung "has not been able to initiate the business for sale of its modem chipset to handset manufacturers other than itself."

(e)     Intel also tried to manufacture chipsets for sale, but Qualcomm's refusal to grant it a license to the standard-essential patents long prevented it from doing so.[43] In 2009, Intel requested from Qualcomm a license in order to manufacture and sell modem chipsets.  The parties held two sets of negotiations in 2009, during which Qualcomm would "not chang[e] its stance that [Qualcomm] could not grant a license

---

[43] Intel has been identified as "Company C" in the 2017 KFTC Final Decision.  As with "Company C," Intel (i) is a chip company; and (ii) acquired a modem chipset manufacturer in 2011 (Infineon) that possessed an SEP licensing agreement.

to their patents for [Intel's] modem chipsets."   As a result, the negotiations were unsuccessful.

(f)     Via Technologies also attempted to enter the chipset manufacturing market, but was prevented from doing so by Qualcomm's anti- competitive behavior.[44] In early 2012, Via Technologies requested a license from Qualcomm for the patents essential to use its WCDMA standard. Qualcomm refused. Via Technologies then sent Qualcomm a written "request that [Qualcomm] comply with the FRAND commitment."   As Via Technologies explained, Qualcomm's proposed, non-license arrangement "did not actually grant any rights to the standard-essential patents" to Via Technologies.   Despite Via Technologies' repeated requests, Qualcomm continued to refuse to offer a license.   As a result, Via Technologies has been unable to enter into the WCDMA-based modem chipset market.

(g)     The KFTC further found that competitor chipset manufacturers made additional requests to Qualcomm for a license to its standard-essential patents, which Qualcomm also rejected.   "Firmly following their business policy, [Qualcomm and its executives] refused to license their SEPs to modem chipset manufacturers."   Due to this

---

[44] Via Technologies has been identified as "Company D" in the 2017 KFTC Final Decision. As with "Company D," Via Technologies (i) is a chip company; obtained a CDMA 2000 license with Qualcomm based on its acquisition of LSI Logic's CDMA division; and (iii) was unable to enter successfully the WCDMA-based modem chipset market after 2012.

business policy, "no licensing agreement was entered into between [Qualcomm] and modem chipset manufacturers in order to manufacture and sell modem chipsets."

91.     The above facts identified in paragraphs 89-90 were not disputed and, in fact, "consistently admitted by the [Qualcomm] Respondents from the investigation stage," which began in August 2014, "through the deliberation" of the KFTC proceedings, which concluded in December 2016. Professor Carrier agreed that, "[a]ccepting the KFTC's factual findings, Qualcomm violated FRAND by refusing to license to competitors."

92.     As the KFTC further found, Qualcomm's refusal to license the standard-essential patents to other chipset makers has stifled competition. Unable to obtain a license from Qualcomm, "competing chipset makers are subject to patent infringement attacks when they sell their chipsets to handset makers that have not entered in license agreements or that have disputes with Qualcomm." This makes it "difficult for the competing chipset makers [to] actively explor[e] markets as they can sell their products only to handset makers that have signed a license agreement with Qualcomm." In addition, "Qualcomm's practice of refusing to license to competing chipset companies has limited the competitors' customers and has created a structure in which Qualcomm can intervene in the transactions between the competitors and their respective customers."

93.     In refusing to license to competitors, the KFTC found that Qualcomm acted with "anti-competitive intent or purpose" and violated the anti-competitive laws.  The evidence detailed in the Order reflected that Qualcomm "had the intention to restrict the competition and they were aware of it." The KFTC fined Qualcomm nearly a billion dollars and also enjoined it from refusing to offer licenses to chipset competitors going forward.

### 2.     FTC: Qualcomm Refused to License Competitors and Bundled Licenses and Chipset Deals

94.     Beginning in September 2014, the FTC launched a rigorous two-and-a-half-year, non-public investigation into Qualcomm's anti-competitive business practices.  The FTC has broad resources available to conduct its investigations and employed those resources in connection with its investigation of Qualcomm. Among other things, prior to bringing its enforcement action, the FTC issued civil investigative demands for documents and took non-public testimony from several witnesses.

95.     The FTC brings an enforcement action in federal court to correct a company's anti-competitive practices only "when it has 'reason to believe' that the law has been or is being violated and it appears to the Commission that a proceeding is in the public interest." [45]   After completing its exhaustive investigation, the FTC

---

[45] FTC Press Release, "FTC Charges Qualcomm With Monopolizing Key Semiconductor Device Used in Cell Phones" (Jan. 17, 2017).

determined that it "has 'reason to believe' that the law has been or is being violated" by Qualcomm and filed an enforcement action on January 17, 2017, based on, among other things, Qualcomm having "consistently refused to license its cellular standard-essential patents to its competitors, in violation of Qualcomm's FRAND commitments."[46] Consistent with the KFTC's findings, the FTC stated, based on its thorough investigation, that Qualcomm had refused to offer standard-essential patent licenses to competitor chip manufacturers, including Intel, MediaTek, and Samsung. By refusing to offer licenses to chipset manufacturers, Qualcomm "bolster[ed] its ability to maintain elevated royalties and other unreasonable license terms."[47]

96.     The FTC further identified how the Company offered customers "royalty relief" conditioned on their purchasing chipsets exclusively from Qualcomm.  In other words, Qualcomm bundled its licenses to the standard-essential patents to the customers' agreement to buy Qualcomm chipsets.  This use of "incentive payments helps Qualcomm 'close the gap' with customers that resist license terms that they regard as unreasonable," and allows Qualcomm to "maintain high royalties on handsets that use competitors' baseband processors."

---

[46] FTC Complaint, No. 5:17-cv-00220-LHK (N.D. Cal. Jan. 17, 2017), ECF No. 1.

[47]   The anti-competitive practices in the FTC's enforcement action were identified through its extensive investigation and confirmed by Lead Counsel's independent investigation, including, among other things, interviews of Qualcomm's former employees and current and competitors.

97.   The FTC described in detail how Qualcomm entered into a series of agreements with Apple, its largest customer, in which it conditioned billions of dollars of "royalty relief" payments on Apple's agreement to purchase Qualcomm chipsets.  These agreements included:

- 2007 Qualcomm-Apple Agreement: Through the parties' 2007 agreement, Qualcomm effectively prohibited Apple from using the prospective fourth-generation cellular standard WiMax, which was being promoted by Intel, one of Qualcomm's competitors at the time. Qualcomm was able to deter Apple from using its competitor's standard by including in the 2007 agreement a provision that conditioned CDMA royalty relief payments on Apple's agreement not to sell or license handsets that implemented the WiMax standard.

- 2011 Qualcomm-Apple Agreement: Qualcomm extracted additional anti-competitive concessions in its 2011 agreement with Apple, which were aimed at further deterring Apple from using Qualcomm's competitors' chipsets. Apple's agreement with Qualcomm required Apple to forfeit all royalty relief payments if, at any point between 2011 and 2016, Apple introduced a new handset that contained a competitor's chipset.[48]

- 2013   Qualcomm-Apple Agreement: Qualcomm continued to bundle its standard-essential patent licensing and chipset sales through its 2013 agreement with Apple, in which Qualcomm agreed to make substantial, annual payments to Apple in 2013, 2014, 2015, and 2016 that were expressly tied to Apple's agreement to purchase exclusively from Qualcomm all of its chipsets for new iPad or iPhone models.   The 2013 Agreement again contained a forfeiture provision under which Apple would forfeit all royalty relief payments and could be required to refund all past payments if it ever used a competitor's chipset.   The 2013 Agreement further provided that Apple would forfeit all future royalty relief payments and could be required to refund past payments if Apple either initiated or induced others to initiate an action challenging Qualcomm's licensing as

---

[48] On December 8, 2015, the European Commission announced its "preliminary conclusion that [Qualcomm] illegally paid a major customer for exclusively using Qualcomm chipsets" since 2011.  In its January 20, 2017 filing in this District, Apple identified itself as the "major customer."

unfair, unreasonable, or discriminatory.

98.    The FTC's enforcement action against Qualcomm is ongoing. On June 26, 2017, the District Court for the Northern District of California denied Qualcomm's motion to dismiss the enforcement action.  In finding that the FTC stated an antitrust claim, the Court agreed that "Qualcomm had an antitrust duty to license its FRAND-encumbered SEPs to its competitors," and "Qualcomm's refusal to deal with its rivals, in violation of its FRAND commitment, was motivated by 'anti-competitive malice.'"  The Court further found that the FTC had adequately stated "that Qualcomm's exclusive dealing arrangements with Apple violated the Sherman Act."

### 3.    Industry Participants: Qualcomm Refused to License Competitors and Bundled Licenses and Chipset Deals

99.    Major industry participants have further confirmed that Qualcomm refused to offer licenses to its competitors and drove out competition by bundling the terms of its licenses and chipset-sale agreements.

### a.    MediaTek

100.  Mr. Wei-Fu Hsu served in the role of General Counsel for MediaTek between September 2008 and his retirement in August 2016.  Prior to that time, between 2004 and September 2008, he was the chief legal officer of MediaTek, in charge of all MediaTek legal matters, and reported directly to the CEO and Chairman. Prior to joining MediaTek, Mr. Hsu practiced law at several large international law

firms, including Jones Day, Bingham McCutchen, Hogan & Hartson (now Hogan Lovells), and Fulbright & Jaworski (now Norton Rose Fulbright), and was a senior circuit design engineer at National Semiconductor Corporation.   Mr. Hsu was named among the top 100 most influential and innovative in-house counsels in the Asia Pacific by Legal 500, and was named the 2015 IAM Strategy 300 by the IAM magazine.   The *Financial Times* named Mr. Hsu among the Asia-Pacific Innovative General Counsels in 2015. Mr. Hsu also won the Silver Award 2016 of the Best Asian & South Pacific Legal Department from the International Legal Alliance.   Mr. Hsu received his B.S.E.E. from National Cheng Kung University, M.S.E.E. from San Jose State University, and J.D. from the University of Washington.   Mr. Hsu is licensed to practice law in Washington and California, as well as before the United States Patent and Trademark Office.

101.   As MediaTek's general counsel, Mr. Hsu was personally involved in MediaTek's negotiations with Qualcomm before and during the Relevant Period. Over that time, MediaTek repeatedly requested, and was consistently denied, a license for Qualcomm's standard-essential patents for WCDMA and other mobile communications technologies.   Mr. Hsu explained that, during the Relevant Period, Qualcomm "refused to license any of [its] patents to MediaTek" or, to his knowledge, any other chipset manufacturer.

102. Consistent with the KFTC's findings, Mr. Hsu explained that Qualcomm also earned higher profits by licensing exclusively to handset manufacturers. Mr. Hsu stated that Qualcomm "can collect a lot more money from a phone maker than a chipmaker." By licensing to handset makers, and not chipset manufacturers, Qualcomm "can charge [a royalty rate] based on the full price of the phone," rather than the price of the chip. Based on his knowledge of industry practice through his 25 years of experience, Mr. Hsu explained that, to his knowledge, Qualcomm is the only chipmaker in the cellular industry that has a policy of refusing to license its standard-essential patents to other chipmakers.

103. Again, consistent with the KFTC's findings (*see supra* at ¶ 90a-c), Mr. Hsu further explained how MediaTek attempted to obtain a license to Qualcomm's standard-essential patents for many years, beginning in approximately 2008. The first set of negotiations between MediaTek and Qualcomm lasted more than a year and included senior executives in the Company's QTL division. As the most senior member of MediaTek's legal team, Mr. Hsu led the negotiations and played an active and direct role in MediaTek's efforts to obtain a license to Qualcomm's standard-essential patents. Mr. Hsu stated that he participated in "regular meetings every two to three weeks" with the Qualcomm QTL executives. During those negotiations, Qualcomm said, in words or substance, "We are not going to license you."

104.  In late 2012, Mr. Hsu sent a letter to Qualcomm that expressly requested that the parties negotiate a license agreement.  The letter "specifically demand[ed] patent license negotiations," Mr. Hsu explained.  Qualcomm waited several months to respond to Mr. Hsu's letter.  Eventually, however, Qualcomm responded, and the parties started in early 2013 to negotiate a new arrangement.  Mr. Hsu stated that during the beginning of the parties' negotiations "we did raise this request for a license several times."  Qualcomm, however, refused to offer a license, insisting upon another, more limited, type of arrangement.

105.  In addition, Mr. Hsu explained that Qualcomm also stifled competition by providing its chipset customers with royalty relief if they largely or exclusively purchased Qualcomm chipsets, rather than MediaTek's or another competitor's chipsets.  Mr. Hsu described, consistent with the FTC, how Qualcomm agreed to reduce customer royalty rates if the customers purchased their chipsets from Qualcomm, rather than other chipset manufacturers.  As Mr. Hsu explained, these were "secrets in the industry."

106.  Mr. Hsu confirmed that he heard from multiple companies during the 2012 to 2013 timeframe, including Huawei, ZTE, and certain other handset manufacturers, about the incentive concept—that if they wanted a royalty reduction, they had to buy Qualcomm chips.  Mr. Hsu explained that, through its bundling of chip sales and the terms of its license agreements, Qualcomm would "use rebates as

bait for more cooperation with customers."  As Mr. Hsu further stated, "[i]t's how they are so successful: they are basically wielding their dominant power in chips, and also wielding dominant power in the essential IP portfolios to gain additional advantages in their business practice."

107.  After reviewing the KFTC's order, Mr. Hsu confirmed that KFTC's findings related to MediaTek were correct and consistent with his best recollection.

### b.    Motorola

108.  Qualcomm's refusal to license to its competitors was further corroborated by a senior, former in-house Motorola commercial lawyer from at least January 2014 through the end of 2015 who was personally involved in Motorola's license negotiations with Qualcomm.  The Motorola lawyer participated in dozens of meetings with Qualcomm, with regular interactions with Fabian Gonell and other interactions with his superior, Aberle, when a matter would escalate to his level.  As the Motorola lawyer explained, "[a]ny document that was negotiated with Qualcomm" from at least January 2014 through the end of 2015 "I was pretty much the one negotiating it."

109.  When the former senior Motorola lawyer was asked whether Motorola was aware that Qualcomm did not license to competing chipset makers, the Motorola lawyer said, "Yes, definitely. MediaTek, Intel – we tried to work with all of them, but you always had to come back to Qualcomm, because [Qualcomm's refusal to license

to competitors] kept anybody else from developing in that space, so we never really had viable options."  The former Motorola lawyer "kn[e]w Intel tried many times" to obtain a license to Qualcomm's essential patents and spoke to Intel about it, with Intel confirming that "Qualcomm refused to license to them."  The Motorola lawyer spoke to about five different people at Intel about this issue, including a senior in-house lawyer in Intel's Patent and Standards group throughout the Relevant Period.

110. The former Motorola lawyer, whose responsibilities included negotiating with Qualcomm, explained how Motorola complained to Qualcomm "constantly" about its refusal to license to competitor chipmakers.  "Our CEO would meet with them and tell them we were sick of how they were doing things," the Motorola lawyer explained.  The Motorola lawyer recalled that "we had many escalation meetings with Mollenkopf," and that Motorola's then-CEO complained to Qualcomm's CEO at the time, Mollenkopf, about the Company's refusal to license to chipset competitors.  The Motorola lawyer attended many meetings with Qualcomm during its negotiations with Motorola and was generally involved in the preparation of Motorola's presentation materials for high- level executive meetings with Qualcomm.  As the Motorola lawyer explained, in its "quarterly business reviews" used during the high-level executive meetings during 2014 through the end of 2015, Motorola included a list of "our grievances" that usually included a reference to Qualcomm's refusal to license to competitors.  The Motorola lawyer believes that,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

in addition to Mollenkopf, Aberle also attended the meetings during which these presentation materials were provided.

### c.  Samsung

111.  Samsung has also publicly confirmed that Qualcomm refused its requests to grant it a license due to its status as a competitor chip manufacturer.  On May 12, 2017, Samsung filed an *amicus* brief in California federal court in support of the FTC's enforcement action against Qualcomm.  In it, Samsung stated that it had "ongoing firsthand experience with the impact of Qualcomm's conduct on chipset competitors."  Samsung explained that it manufactured its own line of chipsets (called the "Exynos chipsets"), which Samsung sought to sell to third parties.  But as Samsung explained, "[d]espite having requested a license from Qualcomm, Samsung cannot sell licensed Exynos chipsets to non-Samsung entities because Qualcomm has refused to license Samsung to make and sell licensed chipsets."  Samsung further stated that Qualcomm has "acknowledge[d] this policy of refusing to license potential competitors."  Samsung concluded that it "has directly experienced, and been directly harmed by, [Qualcomm's] exclusionary conduct."

### d.  Intel

112.  Intel has also publicly confirmed that Qualcomm refused its requests for a license due to its status as a competitor chip manufacturer.  On May 12, 2017, Intel submitted an *amicus* brief in support of the FTC's federal lawsuit against

Qualcomm.  In it, Intel explained that, "[a]s a competitor in the premium cellular chipset market, Intel has seen firsthand the harm caused by the anti-competitive conduct described in the FTC's complaint."  As Intel explained, "for years Qualcomm has maintained an interlocking web of abusive patent and commercial practices that subverts competition on the merits.  These practices have coerced mobile-phone manufacturers … into purchasing the chipsets they need from Qualcomm and Qualcomm alone."  Intel further stated that "[t]he FTC's allegations of anti-competitive conduct reflect the reality that Intel has experienced in the marketplace." In particular, Intel confirmed that Qualcomm has "refuse[d] to license [to] competitors," including Intel.  As Intel explained, "[b]y refusing to license [to] competitors and by coercing customers into exclusivity deals, Qualcomm fences other chipset manufacturers out of the market."

### e.    Apple

113.    Apple designs and manufactures mobile devices and is Qualcomm's single largest chipset customer, singlehandedly comprising 30% of Qualcomm's total earnings. Over the past few years, Apple has privately warned Qualcomm, including Aberle, that Qualcomm has improperly set "royalties based on an illegal manipulation of the market for cellular enabled chips."  As Mr. Bruce Sewell, Senior Vice President and General Counsel of Apple, recounted to Rosenberg in correspondence, Apple cautioned Qualcomm and Aberle "at various times in the past few years" that it would

stop remitting royalties to Qualcomm due its anti-competitive misconduct.  As Mr. Sewell wrote:

> As you may have already heard from our contract manufacturers, Apple has not remitted funds to those contract manufacturers for royalty payments for the quarter ending March 31, 2017. <u>This should come as no surprise to Qualcomm</u>. <u>Derek [Aberle] and I have discussed this eventuality at various times in the past few years</u>. <u>Qualcomm's refusal to license on a fair, reasonable, non-discriminatory basis is harming not only Apple, but our contract manufacturers, other chipset companies and the wider industry</u>.  We believe Qualcomm is charging the contract manufacturers, who in turn pass back to Apple and its customers, royalties based on an illegal manipulation of the market for cellular enabled chips…. Qualcomm's refusal to meet its FRAND commitments and its insistence on taxing our innovation is both illegal and anticompetitive.  We cannot support this behavior.[49]

114.   Qualcomm's bundling of the terms of its licensing and chipset agreements was also documented in Apple's January 20, 2017, filing in this District, and subsequent amendment (the "Apple Complaint"), as well as its May 19, 2017 Particulars of Claim in the High Court of Justice in London, England.[50]  Therein, Apple explained, consistent with the FTC (*see supra* at ¶ 97), that Qualcomm's

---

[49] Letter from B. Sewell to D. Rosenberg, dated April 25, 2017.

[50] Apple and its counsel confirmed that they stand by the factual statements and allegations in their amended complaint against Qualcomm filed in this District, which was the product of their investigation and review of underlying documents in Apple's files. In addition, Apple's Particulars of Claim, filed on May 19, 2017, which contains the same factual assertions relevant here, was supported by a "Statement of Truth," in which Apple and its counsel verified that "believes that the facts stated in this Particulars of Claim are true."

January 8, 2007 agreement with Apple, titled the "Marketing Incentive Agreement," prohibited Apple from marketing wireless devices using the WiMAX standard, which was the prospective 4G standard endorsed by Qualcomm's rival chip manufacturer, Intel.  In exchange for its acceptance of this agreement not to use the standard used for Intel's chips, Apple received a reduced royalty rate from Qualcomm.

115.    Apple also publicly confirmed, consistent with the FTC (*see supra* at ¶ 97), that its February 11, 2011 agreement with Qualcomm, titled the "Transition Agreement," provides Apple with royalty relief on CDMA-standard iPhones so long as Apple exclusively uses Qualcomm's chipsets.  As Apple has now explained, since 2011 "Qualcomm has conditioned billions of dollars in rebates on exclusivity or *de facto* exclusivity from Apple." The "sole purpose of these [rebate] payments was to reduce Apple's royalty burden in exchange for exclusivity."   Apple has further publicly acknowledged, again consistent with the FTC (*see supra* at ¶ 97), that Qualcomm, under its January 1, 2013 amendment to the Transition Agreement, makes royalty relief payments to Apple that are conditioned on Apple's exclusive use of Qualcomm chipsets, as opposed to a competitor's chipsets.

116.    Apple has further stated that, in January 2013, it entered into a Business Cooperation and Patent Agreement (the "BCPA") with Qualcomm that provided additional royalty incentives to Apple. These incentive payments are expressly provided for in Sections 7 and 8 of the BCPA and require Qualcomm to make

quarterly, lump-sum payments to Apple that effectively reduce Apple's per-device royalty payment for each iPhone and iPad sold between 2013 and 2016.  In the second paragraph of Section 7 of the BCPA, Qualcomm conditioned these royalty relief payments on Apple's agreement not to initiate or induce any legal action that, among other things, "claims that Qualcomm failed to offer a license to its SEPs on FRAND terms."   As Apple has publicly explained: "[I]n restraining Apple from initiating action or bringing concerns to law enforcement, Qualcomm conditioned billions of dollars on Apple's silence before courts and regulators about Qualcomm's business practices."

117.   Apple received quarterly royalty relief payments from Qualcomm under the BCPA from 2013 through mid-2016 totaling billions of dollars. Beginning in mid-September 2016, however, Qualcomm refused to make any additional royalty relief payments to Apple because Apple had provided damaging testimony to the KFTC that helped expose certain of Qualcomm's anti-competitive licensing practices.   Qualcomm specifically told Apple that it "'will not make any further BCP Payments to Apple,'" including the nearly $1 billion in royalty relief presently owed, due to "'legal issues'" regarding Apple's interactions with the KFTC and other anti-competition agencies.

118.   Moreover, Qualcomm eventually proposed to pay Apple the nearly $1 billion in royalty relief owed if, according to Apple, it would "recant[] its true and,

in many cases, sworn testimony before government agencies and instead g[i]ve false testimony favorable to Qualcomm." Indeed, Qualcomm sent Apple a letter on December 2, 2016, in which Qualcomm specifically conditioned payment of the nearly $1 billion in royalty relief owed to Apple upon Apple's agreement to "'publicly and specifically retract and correct'" statements Apple made to regulatory agencies concerning Qualcomm's anti-competitive practices.

119. A former senior member of Apple's Patent Licensing & Strategy department during the Relevant Period until June 2015, whose responsibilities included directing Apple's strategies for negotiations and technology transactions, has confirmed that he read the Apple Complaint, and that the allegations therein are consistent with what he knew from his tenure at Apple. He explained that it was known at Apple that Qualcomm had a royalty rate that is "exorbitant" for the license itself, but that there were ways for a customer to offset that through a chipset deal with Qualcomm. He explained that everybody who had a deal with Qualcomm on a substantial level had to navigate this structure that Qualcomm "imposed" on the industry, continuing:

> I do say imposed because you either needed the chips or needed a patent license, and if you needed chips you needed both. So it was like everyone had to deal with it on one level or another. And the fact that Qualcomm could reap more for patent licenses from people who weren't buying chips or weren't willing to do squirrely things with them, that wasn't right under FRAND.

120.   According to the former senior member of Apple's Patent Licensing & Strategy, there were various "structures" and "mechanisms" by which Qualcomm provided royalty rebates tied to chipset purchases. The former senior member of Apple's Patent Licensing & Strategy explained that "[y]ou can structure the deal so that you pay some amount for chips, but if you buy 'x' number of chips over so many years, Qualcomm will give you something else and that will offset what you have to pay for the license."   The former senior member of Apple's Patent Licensing & Strategy department noted that there may be "complexities to the transaction," including whether it's called a "royalty rebate" or by "some other name," but "I've never heard anyone in the industry suggest that the purpose of that was anything other than 'Jesus, we're not going to pay 'x' amount for this license – we got to find another way to effectively have it not cost us that much."

### f.   Qualcomm

121.   A former Qualcomm Vice President of Technology, who worked at the Company in various positions for over twenty years, including through the start of the Relevant Period until August 2015, had experience working with QCT Finance, as well as identifying customers and having them sign up for Qualcomm's chipsets, and was senior enough at Qualcomm to observe its general licensing practices.[51]   He

---

[51] The former Vice President of Technology held multiple, high-level positions at Qualcomm during his over twenty years with the Company, which included over ten years as a Vice President. In his last role, from September 2014 through August 2015,

explained that, when making chipset agreements with customers, "there was always a QTL component that would act in the background."  He also explained that QTL, in fact, "had to" be involved.  "If we were discussing some rebate or something, QTL was there."

122.   The former Qualcomm Vice President of Technology further explained: "If Qualcomm made a sale to a customer who took the complete chipset, and the volume is huge, then there are incentives saying, 'If you use our QCT chipsets, our complete solution, then the licensing agreement will be different, and there will be some rebates you have when you reach a milestone.' Compared to, if you don't use our chipset…"  The milestone could be purchase volume or purchases over a certain length of time.  When asked about who was involved in these negotiations and discussions, he said, "There is a whole QTL licensing team, along with [QCT] Finance, that goes and tries to negotiate the price of the chipset with customers. It's not fixed. Based on volume, you get discounts.  Based on technology, you get discounts."

---

he was a Vice President of Technology of Qualcomm Atheros. In addition, between 2009 and 2011, he was the Vice President of Engineering of AST located in San Diego, which was part of QCT, the chip division. In that role, he identified synergies between cost constraints, customer needs, and QCT's next generation solution and also worked with design, engineering and finance teams to enable them to meet customer targets on costs.  Also, in that role, he led negotiations with U.S. and international network carriers.

123.   The former Vice President of Technology explained that the proposal to the customer was, "Take our chipset and later on there would be some kind of rebate or something applied if the complete solution [chipset plus licensing] is applied." He said, "One portion of the business is chipsets; the other portion is royalty after the chipset gets sold." But he added, "It's tied together." He explained, "QCT Finance also needs to make sure there are conditions created so that chipset sales are incentivized for newer technologies, so Qualcomm can get more royalties."

### F.   Regulators and Investors Respond to Qualcomm's Anti-Competitive Conduct

124.   Defendant's anti-competitive conduct—its refusal to license competitors and bundling of licenses and chipset agreements—has come to light through the revelation of a series of regulatory investigations and findings around the world, an enforcement action by the FTC, and a multi-billion-dollar action by Qualcomm's largest customer.  These revelations have also caused substantial losses for Qualcomm's investors.

125.   First, on November 17, 2015, Qualcomm announced that the KFTC had issued its Case Examiner's Report. The Case Examiner's Report stated that Qualcomm suppressed market competition by excluding competitors. In response to the news, Qualcomm's stock price fell by 9.4% in a single trading day. As Investor's Business Daily recounted that day, "[s]hares of wireless chip giant Qualcomm (QCOM) plunged 9.4% to $48, its lowest point in more than 4 years, after S. Korea's

Fair Trade Commission said the San Diego-based company violated local competition laws with its patent licensing practices."[52]   On November 20, 2015, Forbes similarly stated that the news "had sent investors panicking and the company's stock dropped 10% -- the lowest it's been in the past four years." [53]   Analysts at Bernstein Research stated that the "allegations in the report are troubling.... The Case Examiner's report sheds some troubling light on the details of the complaint." [54]

126.   Second, on December 8, 2015, it was announced that both the Taiwan FTC and European Commission had taken regulatory action against Qualcomm. Specifically, Qualcomm revealed that the Taiwan FTC requested information from the Company and initiated an investigation into whether the Company's patent licensing arrangements violate the Taiwan Fair Trade Act.[55]   The Taiwanese authorities also notified Qualcomm that they were looking into whether "the Company violated a FRAND licensing commitment by declining to grant licenses to

---

[52] Investor's Business Daily, "S. Korea Accuses Qualcomm" (Nov. 17, 2015).

[53] Aaron Tilley, Forbes, "Qualcomm's Biggest Profit Engine Faces More Pressure" (Nov. 20, 2015).

[54] U-Jin Lee, TheStreet.com, "Qualcomm (QCOM) Stock Hammered, South Korea Alleges Illegal Patent Licensing Practices" (Nov. 18, 2015).

[55] The Taiwan FTC investigates and enforces Taiwan's competition laws, and initiates an investigation when it believes that the Taiwan Fair Trade Act has been violated. As part of its investigation, the Taiwan FTC sent a letter to Qualcomm inquiring into the Company's patent licensing arrangements.

chipset makers" and "the Company provided royalty rebates to certain companies in exchange for their exclusive use of the Company's chipsets."[56]  Also on December 8, 2015, the European Commission announced that it had informed Qualcomm of its preliminary finding that the Company illegally compensated a major customer, later identified as Apple, in exchange for its exclusive use of Qualcomm chips, thus violating European Union antitrust laws.

127.   In response to these revelations, Qualcomm's stock price sank further, declining an additional $2.67 per share. Discussing the Taiwan FTC and European Commission investigations and findings, analysts at *The Motley Fool* stated that "Qualcomm investors recently received a double dose of bad news."[57]

128.   *Third*, on December 27, 2016, the KFTC further exposed Qualcomm's misconduct when it confirmed the Case Examiner's findings and issued an $853 million fine against Qualcomm. The fine was the single largest fine ever administered by a Korean regulator, and one of the largest fines ever administered against a cellular telecommunications company by any governmental authority.   The KFTC also ordered Qualcomm, going forward, to offer competitor chipmakers licenses in accordance with the Company's FRAND commitment. The misconduct identified by

---

[56] Qualcomm Inc., SEC Form 10-Q dated April 19, 2017.

[57] Leo Sun, The Motley Food, "Qualcomm Inc. Faces More Antitrust Challenges in Europe and Taiwan" (Dec. 12, 2015).

the KFTC, and discussed above, stunned industry participants, further devaluing Qualcomm's stock.  For example, the publication *Patent Progress* issued a report describing how:

> The Korean Fair Trade Commission ('KFTC') has just taken extreme action against Qualcomm for anti-competitive practices. The KFTC fined Qualcomm about $850 million and ordered it to change the way it licenses its standard-essential patents.  Why did the KFTC do this?

> Well, Qualcomm breaks its commitments to standard-setting organizations, strong-arms its customers into giving free cross-licenses, and blocks competitors from entering its chip market.[58] The report further highlighted how the KFTC found facts "show[ing] a deliberate (and successful) attempt to monopolize the CDMA chip market using its CDMA- essential patents." The report continued that "Qualcomm refuses to license other chip manufacturers" because "[a]pparently, Qualcomm determined that it would be difficult to remain profitable in the CDMA market if it did license other chip manufacturers."

129.  *Fourth*, on January 17, 2017, the FTC filed an enforcement action based on, among other things, Qualcomm's "refusal to license standard-essential patents to competitors" and its demanding "exclusivity from Apple in exchange for reduced patent royalties." In response to these revelations, Qualcomm's stock price sank further, declining an additional $2.48 per share.  As *The Street* reported that day, "[t]he news sent Qualcomm shares sharply lower by 4% to $64.19 on Tuesday on fears of damage to its lucrative business model."[59]   Analysts at *Seeking Alpha*

---

[58] Matt Levy, Patent Progress, "KFTC Takes Action Against Qualcomm" (Jan. 5, 2017).

[59] Annie Palmer, The Street, "The FTC Rocks Qualcomm" (Jan. 17, 2017).

similarly stated that Qualcomm "lost roughly $20bn in market cap in just a few days after the announcement.... In our discussion with analysts and legal experts, Qualcomm's licensing business model and potentially a portion of QCT is perceived to be in jeopardy."[60]   Analysts at *The Motley Fool* likewise commented that "Qualcomm brushed off these accusations, but the stock's performance following the news shows that investors don't share the same confidence."[61]

130.   *Finally*, Qualcomm's anti-competitive conduct was further exposed through a major lawsuit by Qualcomm's largest customer, Apple.  On January 20, 2017, Apple initiated a federal court action against Qualcomm, which further detailed the Company's abuses of monopolistic power through its refusal to license competitors and its exclusivity contracts that prohibited Apple from purchasing chips from competitors. In addition, the action disclosed that Qualcomm owed Apple over a billion dollars in royalty relief rebates, which Qualcomm withheld in response to Apple's testimony to the KFTC. On the same day it filed its lawsuit, Apple issued the following statements:

> Qualcomm built its business on older, legacy, standards but reinforces its dominance through exclusionary tactics and excessive royalties. Despite being just one of over a dozen companies who contributed to basic cellular standards, Qualcomm insists on charging Apple at least

---

[60] CDM Capital, Seeking Alpha, "Qualcomm: A Cheap Stock In An Expensive Market" (Apr. 11, 2017).

[61] Timothy Green, The Motley Fool, "Qualcomm Reports Sluggish Growth as Lawsuits Loom" (Jan. 26, 2017).

five times more in payments than all the other cellular patent licensors we have agreements with combined.

To protect this business scheme Qualcomm has taken increasingly radical steps, most recently withholding nearly $1B in payments from Apple as retaliation for responding truthfully to law enforcement agencies investigating them.[62]

131.   The news of Apple's revelations further surprised investors, with the financial press reporting that investors were "spooked."[63]   Analysts at *Bernstein Research* responded, downgrading Qualcomm's stock and warning investors to"[e]xpect overhang from what appears to be an all-out attack on the business model from both regulators and largest customers [which] will remain for quite some time."[64]   Following the revelations contained in the Apple action, Qualcomm's stock price plummeted over 12% on particularly high trading volume.

132.   With each of these revelations, investors lost billions of dollars in market value. In total, investors suffered over $32 billion in market capitalization losses as a result of the disclosures discussed above.

---

[62] Susan Decker, Alex Webb, Ian King, Bloomberg, "Apple Sues Qualcomm Over Patent Royalties in Antitrust Case" (Jan. 20, 2017).

[63]   Aaron Pressman, Fortune, "Qualcomm Blasts Apple Over Alleged Chip Manipulations" (Apr. 10, 2017).

[64] Tiernan Ray, Barron's, "Qualcomm Plunges: Bad News When Your Top Customer Sues You, Says Bernstein" (Jan. 23, 2017).

## VI. DEFENDANT'S FALSE AND MISLEADING STATEMENTS AND OMISSIONS

133. Defendant made materially false and misleading statements during the Relevant Period in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Among other things:

(i) Defendant represented to investors that Qualcomm made its standard-essential patents "available to the industry through its licensing program" on a "non-discriminatory" basis when, in reality, Qualcomm refused to license competitor chipmakers;

(ii) Defendant represented to investors that Qualcomm's "patent licensing practices" had been "maintained for almost two decades" when, in reality, Qualcomm materially altered its licensing practices in 2008, creating significant business and regulatory risks;

(iii) Defendant represented to investors that Qualcomm's business and licensing divisions were kept "separate" and that they "don't bundle" when, in reality, Qualcomm refused to license companies if they were a Qualcomm chipset competitor and provided licensees with royalty relief conditioned on their exclusive purchase of Qualcomm chips; and

(iv) Defendant represented to investors that Qualcomm adopted a "pro-competitive" licensing model that "facilitated competition" when, in reality, Qualcomm instituted a business model and implemented a set of licensing policies that stifled and blocked competition, enabling it to achieve market dominance.

134. Defendant also omitted material facts when speaking to investors during the Relevant Period in violation of Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Once Defendant decided to tout its purported pro-competitive and non-discriminatory licensing practices, it was required to do so in a manner that did not mislead investors. Among other things, Defendant misled

investors by omitting that it: (i) refused to license to competitor chipmakers, including MediaTek, Samsung, Intel, and Via Technologies; (ii) bundled the terms of its chipset and license agreements by, among other things, providing handset manufacturers royalty relief conditioned on their exclusive use of Qualcomm chips; and (iii) amended its licensing policies in 2008 by refusing to license to competitors.

### A.    False Statements in 2013

#### 1.    2013 Form 10-Q Quarterly Reports

135.   During 2013, Qualcomm issued three quarterly reports with the SEC on Form 10-Q, each of which was signed by Jacobs.  These quarterly reports, which were filed on January 30, April 24, and July 24, 2013, touted "the benefits of our business model and our extensive technology investments in promoting a highly competitive … wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products."

136.   The statements identified in paragraph 135 were false and misleading when made. Far from "promoting a highly competitive … wireless industry" and "enabling new, highly cost-effective competitors to their products," Qualcomm has refused to license competitors its patents essential to the cellular standard.  The statements identified in paragraph 135 also omitted material facts when made, including that: (i) Qualcomm maintained a policy in which it refused to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has,

in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm stifled competition by bundling the terms of its chipset and license agreements, conditioning royalty relief on the customer's exclusive use of Qualcomm chipsets.

### 2.      2013 Annual Meeting of Stockholders

137.   On March 5, 2013, Jacobs, Rosenberg, Mollenkopf, and Aberle addressed investors at Qualcomm's 2013 Annual Meeting of Stockholders.  During his opening remarks, Jacobs discussed the Company's "record revenues," which he attributed to its purported business model of "licens[ing] broadly," explaining:

> [O]ne of the things that we've really focused on was making sure that we license broadly, that we were seen as a company who is an enabler for the rest of the industry, and so we aren't seen as a tax collector but we're seen as an R&D engine, an innovation engine that helps our partners grow their businesses and it's worked extremely well.

138.   Jacobs' statements quoted in paragraph 137 were materially false and misleading when made. Contrary to Jacobs' statement that Qualcomm focused on "making sure that we license broadly" and is "seen as a company who is an enabler for the rest of the industry," Qualcomm took affirmative steps to refuse to license its essential patents to an entire segment of the industry— namely, competitor chipset manufacturers.  The statements identified in paragraph 137 also omitted material facts when made, including that: (i) Qualcomm's business and licensing model included

refusing to license its patents essential to the cellular standards to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, refused to license its patents essential to the cellular standards to competitor chipset manufacturers, including MediaTek, Samsung, Intel, and Via Technologies.

### 3.     2013 Form 10-K Annual Report

139.   On November 6, 2013, Qualcomm filed its annual report with the SEC for its fiscal year 2013 ("2013 Form 10-K"), which was signed by Jacobs.   In the 2013 Form 10-K, Qualcomm stated that it had "committed to [the] standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis." Qualcomm further represented that "[w]e have licensed or otherwise provided rights to use our patented technologies to interested companies on terms that are fair, reasonable and non- discriminatory."

140.   The statements identified in paragraph 139 were false and misleading when made. Qualcomm has not licensed "interested companies on terms that are fair, reasonable and non-discriminatory."  Rather, the Company has discriminated against, and refused to license its standard-essential patents to, competitor chipset manufacturers, as well as discriminated against licensees by providing royalty relief to customers who agreed to purchase exclusively Qualcomm chipsets.   The statements identified in paragraph 139 also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy by which it refused to

license the standard-essential patents to competitor chipset manufacturers; Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm, in licensing its essential patents, has discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

141.   Qualcomm's 2013 Form 10-K also purported to describe its contribution to "Competition," claiming that "[w]e have facilitated competition in the wireless communications industry by licensing our technologies to, and therefore enabling, a large number of manufacturers."  This statement was false, misleading, and omitted material facts. Far from "facilitat[ing] competition," Qualcomm stifled competition in the cellular communications industry, and did so by, among other things, refusing to license to chipset manufacturers its patents essential to the wireless standards, as well as by bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets.

142.   Qualcomm's 2013 Form 10-K also touted, and purported to describe, the Company's "strategy," stating that "[o]ur strategy to make our patented technologies broadly available has been a catalyst for industry growth, helping to enable a wide range of companies offering a broad array of wireless products and features while driving down average and low-end selling prices for 3G handsets and

other wireless devices." This statement was false and misleading when made. Rather than "make [its] patented technologies broadly available," Qualcomm refused to license its technology to an entire segment of the industry—namely, its global rival chipset manufacturers. This statement also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy by which it refused to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

### 4.   Q4 2013 Earnings Call

143.   On November 6, 2013, Qualcomm held an investor conference call to discuss the Company's results for the fourth quarter and full year of 2013. During Mollenkopf's opening remarks, Mollenkopf purported to describe and touted Qualcomm's "broad licensing program," which supposedly enabled the Company to obtain record revenues. Specifically, he stated: "Through our broad licensing program, we continue to foster innovation, and enable a large and growing ecosystem that benefits wireless consumers worldwide."

144.   The statement identified in paragraph 143 was false, misleading, and omitted material facts when made. Contrary to Mollenkopf's statement that Qualcomm maintained a "broad licensing program" Qualcomm refused to license its

technology to an entire segment of the industry—namely, its competitor chipset manufacturers.  The statements identified in paragraph 143 also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy by which it refused to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

### 5.    2013 San Diego Union Tribune Article: Altman Interview

145.   On November 22, 2013, *The San Diego Union Tribune* published an interview with Altman. During the interview, Altman was asked "[h]ow come this licensing model has worked over the years?"  In response, Altman stated that Qualcomm "make[s] [its patents] available to the industry through its licensing program…. It allows more and more competition to get into the marketplace where there is no way they would be able to otherwise."

146.   Altman's statement identified in paragraph 145 was false and misleading when made. Contrary to Altman's statement, Qualcomm did not make its patents "available to the industry through [its] licensing program."   Rather, Qualcomm refused to license its technology to a substantial segment of the industry—namely, its competitor chipset manufacturers.  The statement identified in paragraph 145 also omitted material facts when made, including that: (i) Qualcomm maintained

a licensing policy in which it refused to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, and Via Technologies; and (iii) Qualcomm maintained a successful licensing program by bundling the terms of its license agreements with the terms of its chipset agreements and by providing royalty relief to Apple and other licensees who purchased all or most of their chipsets from Qualcomm.

### B.     False Statements in 2014

#### 1.     2014 Form 10-Q Quarterly Reports

147.   During 2014, Qualcomm issued quarterly reports with the SEC on Form 10-Q.  The quarterly reports were each signed by Mollenkopf on January 29, April 23, and July 23, 2014.  Each of the reports touted "the benefits of our business model and our extensive technology investments in promoting a highly competitive … wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products."

148.   The statements identified in paragraph 147 were false and misleading when made.  Far from "promoting a highly competitive … wireless industry" and "enabling new, highly cost-effective competitors to their products," Qualcomm has refused to license competitors its patents essential to the cellular standard.   The

statements identified in paragraph 147 also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy in which it refused to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm stifled competition by bundling the terms of its chipset and license agreements, conditioning royalty relief on a customer's exclusive use of Qualcomm chipsets.

### 2.    2014 PowerTalk Interview

149.    On February 18, 2014, Davidson gave an interview on "PowerTalk," an online program hosted by Chris Versace, editor of the investment newsletter PowerTrend *Profits*, about Qualcomm and the state of the mobile industry. During the interview, Davidson touted Qualcomm's purported business model, stating that Qualcomm "created this unique business model of not holding our patents to ourselves to advantage our own products, but creating a product of them and broadly licensing them on a pro-active basis."

150.    The statement identified in paragraph 149 was false and misleading when made. Contrary to Davidson's statement that Qualcomm maintained a "business model of not holding our patents to ourselves to advantage our own products," Qualcomm in reality held its patents to itself by refusing to license the

essential patents to competitor chipset manufacturers in order to advantage its chipset business.  The statement identified in paragraph 149 also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy in which it refused to license its standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

### 3.    2014 Form 10-K Annual Report

151.   On November 5, 2014, Qualcomm filed its annual report with the SEC for its fiscal year 2014 ("2014 Form 10-K"), which was signed by Mollenkopf.  In the 2014 Form 10-K, the Company stated that it had "committed to such standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis."  This statement was misleading and omitted material facts when made, including that: (i) Qualcomm has, contrary to its commitment to the standard-setting bodies, discriminated against, and refused to license its standard-essential patents to, competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm has, in licensing

its essential patents, discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

152.   Qualcomm's 2014 Form 10-K also purported to describe the Company's contribution to "Competition," claiming that "[w]e have facilitated competition in the wireless communications industry by licensing our technologies to, and therefore enabling, a large number of manufacturers." This statement was false, misleading, and omitted material facts. Far from "facilitat[ing] competition," Qualcomm stifled competition in the cellular communications industry, and did so by, among other things, refusing to license to competitor chipset manufacturers the Company's patents essential to the wireless standards, as well as by bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets.

153.   Qualcomm's 2014 Form 10-K also touted, and purported to describe, the Company's "strategy," stating that "[o]ur strategy to make our patented technologies broadly available has been a catalyst for industry growth, helping to enable a wide range of companies offering a broad array of wireless products and features while driving down average and low-end selling prices for 3G handsets and other wireless devices." This statement was false and misleading when made. Rather than "make [its] patented technologies broadly available," Qualcomm refused to license its technology to an entire segment of the industry—namely, its competitor

chipset manufacturers. This statement also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy in which it refused to license its standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

### C.   False Statements in 2015

#### 1.   2015 Form 10-Q Quarterly Reports

154.   Qualcomm issued quarterly reports with the SEC on Form 10-Q on January 28, April 22, and July 22, 2015. Each quarterly report was signed by Mollenkopf.  All of the reports touted "the benefits of our business model and our extensive technology investments in promoting a highly competitive … wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products."

155.   The statements identified in paragraph 154 were false and misleading when made. Far from "promoting a highly competitive … wireless industry" and "enabling new, highly cost-effective competitors to their products," Qualcomm has refused to license competitors its patents essential to the cellular standard. The statements identified in paragraph 154 also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy in which it refused to

89

license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

### 2. 2015 Mollenkopf Presentation at SIEPR Economic Summit

156.   On March 13, 2015, Mollenkopf was interviewed at the 12th SIEPR (Stanford Institute for Economic Policy Research) Economic Summit.   During the interview, Mollenkopf touted the Company's "business model," which purportedly allowed "the entire market" to obtain a license, stating that "we figured out that the right business model was to actually focus on licensing the inventions, essentially through the standards bodies <u>so that the entire market could play</u>, instead of practicing the inventions ourselves, and then we would enable more market participants to enter into that by selling kind of enabling technologies."

157.   The statement identified in paragraph 156 was materially false and misleading when made.   Contrary to Mollenkopf's statement that Qualcomm maintained a "business model," which purportedly licensed its technology to the standard-essential bodies "so that <u>the entire market</u> could play," Qualcomm refused to license its technology to an entire segment of the market— namely, its competitor chipset manufacturers.   The statement identified in paragraph 156 also omitted material facts when made, including that: (i) Qualcomm revised its licensing model

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

in 2008 and, after that point, maintained a policy that refused to license the standard-essential patents to competitor chipset manufacturers; and license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

### 3.     2015 Form 10-K Annual Report

158.   On November 5, 2015, Qualcomm filed its annual report with the SEC for its fiscal year 2015 ("2015 Form 10-K"), which was signed by Mollenkopf.  In it, the Company stated that it had "committed to such standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis."  This statement was misleading and omitted material facts when made, including that: (i) Qualcomm has, contrary to its commitment to the standard-setting bodies, discriminated against, and refused to  license  its  standard-essential  patents  to,  competitor  chipset  manufacturers;  (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm, in licensing its essential patents, has discriminated  against  and  provided  unfavorable  terms  to  customers  that  did  not purchase chipsets exclusively from Qualcomm.

159.   Qualcomm's 2015 Form 10-K also purported to describe the status of the "Competition," claiming that "[w]e have facilitated competition in the wireless

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

communications industry by licensing our technologies to, and therefore enabling, a large number of manufacturers." This statement was false, misleading, and omitted material facts. Far from "facilitat[ing] competition," Qualcomm stifled competition in the cellular communications industry, and did so by, among other things, refusing to license to chipset manufacturers its patents essential to the wireless standards, as well as by bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets.

160. Qualcomm's 2015 Form 10-K also touted, and purported to describe, the Company's "strategy," stating that "[o]ur strategy to make our patented technologies broadly available has been a catalyst for industry growth, helping to enable a wide range of companies offering a broad array of wireless products and features while driving down average and low-end selling prices for 3G handsets and other wireless devices." This statement was false and misleading when made. Rather than "make [its] patented technologies broadly available," Qualcomm refused to license its technology to an entire segment of the industry—namely, its competitor chipset manufacturers. The statement also omitted material facts when made, including that: (i) Qualcomm's business and licensing model included refusing to license to competitor chipset manufacturers; and (ii) consistent with its business and licensing model, Qualcomm has refused to license its standard-essential patents to

competitor chipset manufacturers, including MediaTek, Samsung, Intel, and Via Technologies.

### 4.    Qualcomm November 17, 2015 Press Release

161.   On November 17, 2015, Qualcomm issued a press release in response to the KFTC Case Examiner's Report, which stated that the Company restricted market competition by excluding its competitors.  In Qualcomm's press release in response, Defendant stated that "the allegations and conclusions in the [KFTC Case Examiner's Report] are not supported by the facts."  Defendant further represented that "[o]ur patent licensing practices, which we and other patent owners have maintained for almost two decades, and which have facilitated the growth of the mobile communications industry in Korea and elsewhere, are … pro-competitive."

162.   Defendant's statements identified in paragraph 161 were false and misleading when made. Contrary to Defendant's statements, the facts did support the KFTC Case Examiner's conclusion that Qualcomm refused to license the standard-essential patents to competitor chipset manufacturers.  In addition, Qualcomm's licensing practices were not "pro-competitive," but rather stifled competition by refusing to offer licenses to competitors and bundling the terms of its license and chipset agreements. Finally, Qualcomm did not maintain the same licensing practices for "almost two decades," as stated in its press release; rather Qualcomm revised its licensing model in 2008 and, after that point, maintained a policy that refused to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

license the standard-essential patents to competitor chipset manufacturers.   The statements identified in paragraph 161 also omitted material facts when made, including that: (i) Qualcomm revised its licensing practices in 2008 and, after that point, maintained a policy that refuses to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, and Via Technologies; and (iii) Qualcomm maintained anti-competitive licensing practices, including by bundling the terms of its license and chip-sale agreements and by discriminating against potential licensees if they competed with Qualcomm or refused to buy all or most of their chipsets from Qualcomm.

### D.     False Statements in 2016

#### 1.      2016 Form 10-Q Quarterly Reports

163.   Qualcomm issued quarterly reports with the SEC on Form 10-Q on January 27, April 20, and July 20, 2016. Each quarterly report was signed by Mollenkopf.  All of the reports touted "the benefits of our business model and our extensive technology investments in promoting a highly competitive … wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products."

94

164.   The statements identified in paragraph 163 were false and misleading when made. Far from "promoting a highly competitive … wireless industry" and "enabling new, highly cost-effective competitors to their products," Qualcomm has refused to license competitors its patents essential to the cellular standard. The statements identified in paragraph 163 also omitted material facts when made, including that: (i) Qualcomm maintained a policy in which it refused to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm maintained a successful licensing program by bundling the terms of its license agreements with the terms of its chipset agreements and by providing royalty relief to Apple and other licensees who purchased all or most of their chipsets from Qualcomm.

## 2.    2016 First Quarter Earnings Call

165.   On January 27, 2016, Qualcomm made a presentation to investors during the first quarter 2016 earnings conference call.   During the investor conference, Rosenberg touted how, "our licensing model, as you know, has been in effect for quite a few decades" and how this "licensing model of sharing our intellectual property" has "not only been effective, but has enhanced competition."

166.   The statements identified in paragraph 165 were materially false and misleading when made.   Contrary to Rosenberg's statement that Qualcomm's licensing model for "quite a few decades" has been "sharing our intellectual property," Qualcomm's licensing model refused to license its standard-essential patents to competitor chipset manufacturers.   The statements identified in paragraph 165 also omitted material facts when made, including that: (i) Qualcomm revised its licensing model in 2008 and, after that point, maintained a policy that refuses to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies.

### 3.   May 28, 2016 Shanghai Forum

167.   On May 28, 2016, Aberle spoke at the Shanghai Forum about the Company's business model. Aberle stated that "you think about Qualcomm … [o]nce we solve [technological problems], we don't keep the technology to ourselves: our business model is to share that technology through licensing."

168.   The statement identified in paragraph 167 was false and misleading when made and omitted material facts.   Contrary to Aberle's statement, Qualcomm's business model included refusing to license its standard-essential patents to an entire segment of the industry—namely, its competitor chipset manufacturers.   The

statement identified in paragraph 167 also omitted material facts when made, including that: (i) Qualcomm maintained a policy in which it refused to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

### 4.   June 24, 2016 Rosenberg Interview

169.   On June 24, 2016, Rosenberg spoke to a group of reporters in China. In an article published by the *Taipei Times*, Rosenberg stated that "'[w]hen we charge our license, it will be fair, reasonable and non-discriminate.  We have done that for 30 years.'"

170.   The statement identified in paragraph 169 was materially false and misleading when made. Qualcomm has not licensed for the past 30 years on terms that are "fair, reasonable and non-discriminate."  Rather, since 2008, the Company had discriminated against, and refused to license its standard-essential patents to, an entire segment of the industry—namely, its competitor chipset manufacturers.  The statement identified in paragraph 169 also omitted material facts when made, including that: (i) Qualcomm revised its licensing model in 2008 and, after that point, maintained a policy that refuses to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy,

consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and Qualcomm, in licensing its essential patents, has discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

### 5.    2016 Form 10-K Annual Report

171.   On November 2, 2016, Qualcomm filed its annual report with the SEC for its fiscal year 2016 ("2016 Form 10-K"), which was signed by Mollenkopf.  In the 2016 Form 10-K, the Company stated that it had "committed to such standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis."  This statement was misleading and omitted material facts when made, including that: (i) Qualcomm has, contrary to its commitment to the standard-setting bodies, discriminated against, and refused to license its standard-essential patents to, competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and(iii) Qualcomm, in licensing its essential patents, has discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

172.   Qualcomm's 2016 Form 10-K also purported to describe the status of the "Competition," claiming that "[w]e have facilitated competition in the wireless communications industry by licensing our technologies to, and therefore enabling, a large number of manufacturers."  This statement was false, misleading, and omitted material facts.  Far from "facilitat[ing] competition," Qualcomm stifled competition in the cellular communications industry, and did so by, among other things, refusing to license to competitor chipset manufacturers its patents essential to the wireless standards, as well as by bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets.

173.   Qualcomm's 2016 Form 10-K also touted, and purported to describe, the Company's "strategy," stating that "[o]ur strategy to make our patented technologies broadly available has been a catalyst for industry growth, helping to enable a wide range of companies offering a broad array of wireless products…."  This statement was false and misleading when made.  Rather than "make [its] patented technologies broadly available," Qualcomm refused to license its technology to an entire segment of the industry—namely, its competitor chipset manufacturers.  The statement also omitted material facts when made, including that: (i) Qualcomm's business and licensing model included refusing to license to competitor chipset manufacturers; and (ii) consistent with its business and licensing

model, Qualcomm has refused to license its standard-essential patents to competitor chipset manufacturers, including MediaTek, Samsung, Intel, and Via Technologies.

### E.    False Statements in 2017

#### 1.    Qualcomm January 17, 2017 Press Release

174.    On January 17, 2017, the FTC filed an enforcement action against Qualcomm in the United States District Court for Northern District of California, stating that Qualcomm refused to license its cellular standard-essential patents to competitors and entered into exclusive dealing arrangements with large mobile-phone manufacturers in violation of antitrust laws.  That same day, Qualcomm issued a press release in response to the FTC complaint.  In it, Rosenberg again assured investors that the Company engaged in "broad-based licensing of those technologies [the standard-essential patents] on fair, reasonable and non- discriminatory terms."

175.    Rosenberg's statement identified in paragraph 174 was materially false and misleading when made. Rosenberg's statement that Qualcomm's licensing was "broad-based" and completed on "fair, reasonable and non-discriminatory terms" was false and misleading because Qualcomm discriminated against, and refused to license to, competitor chipset manufacturers, including MediaTek, Samsung, Intel, and Via Technologies.  The Company also discriminated against licensees that would not buy all or most of their chipsets from Qualcomm and tied the terms of the license agreements to the terms of the chipset agreements.  The statement also omitted

100

material facts when made, including that: (i) Qualcomm has, contrary to its commitment to the standard-setting bodies, discriminated against, and refused to license its standard-essential patents to, competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm, in licensing its essential patents, has discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

176.   A host of facts, in addition to those discussed above, support a strong inference that Qualcomm and the Executive Officers knew or were deliberately reckless in not knowing the true facts concerning Qualcomm's licensing and chipset sales practices when making the materially false and misleading statements and omissions discussed herein.

177.   *First*, Qualcomm has admitted that it intentionally refused to license its standard-essential patents to competitor chipmakers.   As discussed above, the Company repeatedly told investors both before and during the Relevant Period that they licensed to "anyone," "never refused to license," made their patents "available to the entire industry," and licensed to "all interested companies on terms that are fair, reasonable and non-discriminatory."   However, as stated in the KFTC's January

2017 Order, Qualcomm "<u>consistently admitted</u>" during the non-public investigation that by 2008, it "established a business policy amending their license programs" and began "refus[ing] to execute license agreements with competing modem chipset manufacturers even if they requested [standard essential patents]."

178.   Qualcomm's admission that the Company, in fact, intentionally refused to license to competitors pursuant to a changed business policy demonstrates scienter.

179.   *Second*, Qualcomm knew and acknowledged publicly that a refusal to license competitors would be an improper, discriminatory act in violation of the Company's FRAND commitment.  For example, in speaking to the FTC, Qualcomm specifically acknowledged that "[c]ertainly, a patent-holder who gives a FRAND commitment <u>gives up the right to refuse to license</u>."   And Rosenberg further acknowledged and publicly stated that "a decision that we are going to license you and not license you … <u>would be discriminatory</u>."   That the Company and its Executive Officers knew—and publicly acknowledged—that their refusal to license to competitors was, indeed, "discriminatory" and a violation of FRAND further supports the scienter inference.

180.   *Third*, the long duration of Defendant's refusal to license competitors and discriminatory bundling of its license and chipset agreements supports an inference of scienter.  By 2008, Qualcomm amended its policy and refused to license its standard-essential patents to chipset competitors.  During the ensuing period,

major competitors—including MediaTek, Samsung, Intel, and Via Technologies—made repeated requests to Qualcomm's executives for a license and were categorically denied. Likewise, Qualcomm has, contrary to its representations, bundled the terms of its license agreements and chipset agreements for many years. Indeed, its agreements with Apple in 2007, 2011, and 2013 all provided for royalty relief conditioned on the exclusive use of Qualcomm chipsets. Business policies maintained for nearly a decade and across a Company's client and competitor base do not happen by accident or without the knowledge of the Company's executives.

181. *Fourth*, Qualcomm's purported commitment to "non-discriminatory" licensing was a critical Company policy. Indeed, as Davidson acknowledged, Qualcomm's commitment to "license anyone who wants to go and have a license in CDMA" was the "hallmark" of Qualcomm's licensing policy. For this reason, Alex Rogers, Qualcomm's Senior Vice President and Legal Counsel, colorfully stated prior to the Relevant Period that, "[s]aying we refuse to license competitors is like saying McDonald's refuses to sell hamburgers… It's nuts. It's crazy." That Qualcomm would violate its "hallmark" policy is compelling evidence of scienter.

182. *Fifth,* Qualcomm's refusal to license the Company's standard-essential patents to competitors was unprecedented. MediaTek's general counsel confirmed that, to his knowledge, Qualcomm is the only chipmaker in the cellular industry that has a policy of refusing to license its standard-essential patents to other chipmakers.

Indeed, as Professor Carrier explained, "a refusal to license, after having made the FRAND commitment, is as fundamental a breach of the FRAND licensing promise as can be envisioned." Qualcomm knew or were deliberately reckless in not knowing that the Company had such a blatantly anti-competitive policy and practice.

183. *Sixth*, Qualcomm's misrepresentations concern its core businesses. As Jacobs acknowledged during a March 5, 2013 investor conference, Qualcomm's licensing business (QTL) and its chip business (QCT) are its two "core businesses." The Company's press releases filed on Form 8-K during the Relevant Period further confirmed that these two businesses were, in fact, Qualcomm's two "core operating businesses." The Company's annual reports on Form 10-K during the Relevant Period likewise acknowledged that Qualcomm conducts its business "primarily through" QCT and QTL. Indeed, during each year from 2012 to 2016, between 96% and 99% of the Company's total revenues were derived from its licensing and chip businesses. Particularly given their near-total contribution to the Company's bottom line, Defendant knew, or was deliberately reckless in not knowing, the Company's actual, undisclosed practices.

184. *Seventh*, the Executive Officers were directly and extensively involved in developing and maintaining Qualcomm's licensing model, as well as negotiating its key licensing and chipset sales agreements:

- **Altman** played a key role in designing and implementing the Company's

licensing model.   According to Qualcomm's founder Dr. Irwin Jacobs, Altman was the "principal person in working through the very many contracts that we have signed, licensing agreements, with over 100 companies around the world."   At one annual shareholder meeting, Altman was likewise introduced by the Company as the "strategist and negotiator who is primarily responsible for guiding the development of the company's intellectual property protection and licensing strategy."   At that same shareholder meeting, Altman acknowledged that he had "been an active participant in essentially every major transaction in which the company has taken part." Similarly, Altman has been described by the Company as "very involved in the process of licensing contracts and negotiations the company has had over the last several years," and the "chief architect of the Company's licensing business model."[65]   Altman was a member of Qualcomm's Executive Committee, which "drive[s] Qualcomm's overall global strategy."

- **Aberle** also played an integral role in the preparation and negotiation of the Company's license agreements over the past decade, as well as overseeing and executing its licensing model.   The Company has recognized, and stated publicly, that Aberle was "responsible for overseeing Qualcomm's technology and IP licensing business" and "[f]or well over a decade, [Aberle] has played a leading role in structuring and negotiating key license agreements with Qualcomm's licensees."[66]   For example, Qualcomm has publicly stated that Aberle "played a leading role in structuring and negotiating key license agreements with many of our leading licensees, including Ericsson, Huawei, LGE, Motorola, Nokia, RIM, Samsung, ZTE, and many others."   Aberle was further described by Altman as having "significantly contributed to QTL's success by expanding Qualcomm's licensing program."   During an April 23, 2014 earnings call, Mollenkopf described Aberle as "instrumental in creating and growing many important areas of Qualcomm's business over his tenure, including our licensing business." Aberle is a member of Qualcomm's Executive Committee, which "drive[s] Qualcomm's overall global strategy."

- **Rosenberg** oversees Qualcomm's legal matters and participated in the Company's licensing negotiations. Addressing the Company's stockholders

---

[65] Press Release, "Qualcomm Announces Leadership Change and Promotions" (Oct. 4, 2011).

[66] Website biography, Qualcomm Inc., Leadership: Derek K. Aberle, President, https://www.qualcomm.com/company/about/leadership/derek-aberle.

in 2016, Rosenberg emphasized that members of executive management, including himself, were directly involved in the Company's licensing program, stating that "[w]e try to negotiate all the time. That's what we do."[67] Rosenberg frequently communicated with regulatory bodies, including the Senate and FTC on behalf of Qualcomm. Rosenberg was a member of Qualcomm's Executive Committee, which "drive[s] Qualcomm's overall global strategy."

- **Davidson** was directly involved in operations, reporting, and investor relations, as well as executing on the Company's strategic global business activities. At a Citigroup investor conference, when discussing his involvement with the licensing program, Davidson stated that "we talk to our licensees and then obviously our chip customers on an ongoing basis." Both prior to and during the Relevant Period, Davidson was personally involved in the Company's representations to investors that Qualcomm purportedly "will license anyone who wants to go and have a license in CDMA. And that has been the hallmark of that licensing program."

- **Mollenkopf** oversaw the rise of Qualcomm's chipset business and was directly involved in negotiating key chipset agreements. At a New York analyst meeting on November 12, 2009, Mollenkopf stated "I run the chipset business here at Qualcomm" and, at a 2014 investor conference, Mollenkopf further stated that the "first thing to remember is I've been at the Company for a pretty long time, so a little bit shy of 20 years. And in particular really focusing on the chip group for really the last 5 years."[68] Mollenkopf was a member of Qualcomm's Executive Committee, which "drive[s] Qualcomm's overall global strategy."

- **Jacobs** also played a significant role in Qualcomm's adoption of Qualcomm's technologies as industry standards, as well as the Company's licensing policies. As Qualcomm has acknowledged on its website, Jacobs was "a key architect of Qualcomm's strategic vision" with responsibilities including "leadership and oversight of all the Company's initiatives and operations." As the Company's former CEO, Jacobs acknowledged that he made the key decisions as to the Company's "business structure" and made "fundamental

---

[67] Transcript, "Qualcomm Inc. Annual Shareholders Meeting" (Mar. 8, 2016).

[68] Transcript, "Qualcomm at Goldman Sachs Technology and Internet Conference" (Feb. 12, 2014).

changes to enhance value."[69] Jacobs was also a member of Qualcomm's Executive Committee, which "drive[s] Qualcomm's overall global strategy."

185.  During the Relevant Period, the Executive Officers participated in and supervised negotiations with handset customers that tied together technology licensing and chipset sales.  A former Executive Vice President of Products for Blackberry Limited (f/k/a Research In Motion, Ltd.) ("Blackberry") from March 2006 until January 2014, confirmed that Qualcomm upper management, including Mollenkopf and Jacobs, was involved in "blended discussions" of technology licensing and chipset purchases with Blackberry.  The former Executive Vice President attended meetings with Qualcomm's executives and was personally involved in negotiations with Qualcomm on behalf of Blackberry, which designs and manufactures mobile devices and is a Qualcomm chipset customer.  The former Blackberry executive recalled that Mollenkopf participated in a number of meetings with Blackberry executives, including Blackberry's COO, which involved negotiations over the terms of licenses and chipset deals, and Jacobs participated in a similar high-level meeting regarding the 7600 chipset.  Additional representatives from both Qualcomm's licensing division and its chipset division, including the Executive Officers' direct reports, were also directly involved in these "blended discussions," according to the former BlackBerry executive.  He noted that, in fact,

---

[69] Press Release, "Qualcomm Completes Review of Corporate and Financial Structure" (Dec. 15, 2015).

one of the Qualcomm employees that the former Blackberry executive dealt with most directly—the "guy who was pushing the <u>chipsets</u>"—was actually a Vice President from Qualcomm's <u>licensing</u> department.

186.   *Eighth*, the Company made repeated, detailed and unequivocal statements to investors about the Company's licensing model.  As set forth above, Qualcomm told investors that the Company licensed on a non-discriminatory basis and did not bundle their chip- sale and license agreements, making the statements in the Company's quarterly and annual SEC filings, regular investor conferences and press interviews.  The Company prominently touted without reservation its licensing model and purported commitment to licensing across the industry on a non-discriminatory basis.  Having focused on the Company's licensing model so often in its representations to investors, the Company and its Executive Officers knew, or at minimum, were deliberately reckless in not knowing, the Company's actual licensing model.

187.   *Ninth*, the Company issued specific denials about the anti- competitive practices at issue.  It made many of its statements during the Relevant Period in response to questions from analysts and investors.

188.   The Company continued to deny and conceal its true licensing practices even after regulators raised concerns and Qualcomm "consistently admitted" to the KFTC, but not the public, that it refused to license competitors.  For example, on

November 17, 2015, Qualcomm issued a press release in response to the KFTC Case Examiner's Report, which stated that Qualcomm suppressed market competition by excluding competitors.  In its press release, Qualcomm quieted investors' concerns about the Report with assurances that "the allegations and conclusions in the [KFTC's Report] are not supported by the facts," further impressing upon investors that Qualcomm's "patent licensing practices, which we and other patent owners have maintained for almost two decades [are] pro- competitive."  Again, on January 17, 2017, almost immediately after news broke of the FTC's enforcement action, Qualcomm shot back with a press release sharply disputing the government's assertions.  In it, Rosenberg assured investors that, contrary to the FTC's assertions, Qualcomm engaged in "broad-based licensing of [its standard-essential patents] on fair, reasonable and non-discriminatory terms."  Rather than disclose to investors the Company's actual licensing practices, Jacobs and the other Executive Officers blamed "competitors who obviously don't like the fact that you're so successful," and claimed that investigations were a natural consequence of competitors' "envy" of the Company's success.

189.  *Tenth*, the Company knew that investors and analysts were focused on its licensing model.  As Rosenberg stated during an investor conference before the Relevant Period, "clearly [Qualcomm's] business model has been the topic of a lot of discussion over the last few years." Indeed, past allegations had arisen— which

Qualcomm aggressively and successfully assured investors were false—that certain aspects of Qualcomm's licensing practices may be inappropriate.[70]

190.   Analysts and the press published reports that accepted and repeated Defendant's representations in that regard as well as dismissed the allegations denied by the Company.  For example, accepting Defendant's representations, analysts at *Barron's* reported during the Relevant Period that Qualcomm "[i]n addition to manufacturing its own chips, licenses its technology to other chipmakers." Analysts at BMO likewise stated that, in light of the Company's representations and denials, "[w]e do <u>not</u> think the company engages in this anticompetitive practice" of bundling. The Company was thus well aware that the market was heavily relying on the accuracy of its statements.

---

[70] Defendant assured investors regarding these past allegations of inappropriate licensing practices that competitors had "attempted to flood the market with a lot of misinformation"; that the allegations are "are inaccurate and without merit"; that the "result in China is unique to China"; that China's Anti-Monopoly Law "is different in several respects from anti-trust and competition laws in other countries"; that the regulatory issues were actually "commercial disputes"; that the allegations were part of efforts to "avoid paying fair and reasonable royalties"; and that scrutiny is "instigated by competitors who obviously don't like the fact that [Qualcomm] is so successful," among other things. Indeed, during one pre-Relevant Period investor conference, in the context of disputing these prior challenges, Altman specifically assured investors that "[w]e've never refused to license our WCDMA essential patents to any company, and we have never required any company to exclusively buy our WCDMA chips for any purpose."

191.   *Eleventh*, in addition to assuring investors, Qualcomm certified to the standard-setting bodies that the Company licensed its standard-essential patents on fair, reasonable, and non-discriminatory basis.  *See supra* ¶¶ 51-56.  Altman and Qualcomm sent written declarations to standard-setting bodies—including ETSI, CTIA, TIA, ANSI, and ATIS—certifying that the Company was licensing its standard-essential patents to all willing licensees on fair, reasonable, and non-discriminatory terms.  Based on this commitment, Qualcomm's technologies were adopted broadly by standard-setting bodies as cellular standards for much of the developed world. This commitment bound the Company and the Executive Officers because, as Professor Carrier has explained, "[f]or FRAND to be effective, company officials who agree to the commitment must recognize the binding nature of such a promise; otherwise the FRAND commitment would not mean anything."  The Executive Officers knew, or were deliberately reckless in not knowing, that Qualcomm was not abiding by the commitment it had repeatedly made.

192.   *Twelfth*, Qualcomm's anti-competitive practices were directed at the Company's biggest customers and competitors.  Between 2011 and 2016, Qualcomm forced Apple—its single largest customer, which alone provided Qualcomm with up to 30% of its total earnings—into an exclusivity arrangement.  As part of that arrangement, Qualcomm conditioned billions of dollars in royalty rebates on Apple's purchase of chipsets exclusively from Qualcomm.  In addition, Qualcomm has

entered into bundling arrangements with other major customers, including Samsung and LG, two more of the world's leading cell phone makers. Contracts involving 30% or more of the Company's total earnings and royalty relief payments of this magnitude do not go unnoticed by senior management.[71]

193.    *Thirteenth*, industry participants and key customers complained to Qualcomm and its executives about their refusal to license competitors and bundling. For example, Bruce Sewell, Apple's Senior Vice President and General Counsel, complained to Aberle "at various times in the past years" about "Qualcomm's refusal to license on a fair, reasonable, non-discriminatory" basis and forewarned him of the "eventuality" that Apple, as a result, would stop making royalty payments.[72] Likewise, Motorola's CEO told Qualcomm and its CEO during the Relevant Period

---

[71] As the former senior member of Apple's Patent Licensing & Strategy department with many years of industry experience explained: "A senior executive would see where money was coming in, and where money was going out. Usually, money comes in to pay for the chips and that's it.  They certainly would have known what money was going out because we are talking about billions of dollars here, not little amounts of money. It could be bigger than a whole department's annual budget."  Moreover, as to whether the Executive Officers would be aware of Qualcomm's policy of refusing to license competing chipmakers, this former high-level Apple employee noted that "it's unthinkable to me that the people running the most profitable part of their business wouldn't have been making senior management very aware of how that's accomplished, especially if the same companies paying you for licensing agreements are also the ones buying your chips."

[72] Letter from B. Sewell to D. Rosenberg, dated April 25, 2017.

that Motorola was "sick of how [Qualcomm was] doing things," referencing Qualcomm's refusal to license competitors as part of Motorola's list of "grievances." And, as a final example, MediaTek and other chipset makers repeatedly complained to Qualcomm and its executives about the Company's blanket refusal to license competitors.   In light of the repeated complaints, Defendant knew—or was deliberately reckless in not knowing—of the its refusal to license and bundling tactics.

194.  *Fourteenth*, Qualcomm's refusal to license competitors and its bundling involved serious violations of laws.  In its enforcement action, which has been sustained by a federal court in this Circuit, the FTC stated that Qualcomm's "refus[al] to license FRAND-encumbered patents to baseband processor competitors … is anticompetitive and constitutes an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)."  The KFTC likewise determined that Qualcomm's conduct was illegal under Korean law and fined the Company nearly one billion dollars. In addition, competition authorities in the EU and Taiwan have leveled similar charges, and the European Commission preliminarily concluded that Qualcomm violated EU antitrust laws by paying Apple to exclusively use Qualcomm's chipsets.  That the Company's undisclosed licensing practices involved grave violations of the laws that already have resulted in nearly a billion dollars in fines further supports an inference of scienter.

195.   *Fifteenth*, Qualcomm's refusal-to-license-competitors policy enabled the Company to establish market dominance.  Qualcomm's policy of refusing to license its standard-essential patents to competitor chipmakers has, since being implemented in 2008, foreclosed meaningful competition in the mobile chipset market and allowed Qualcomm to seize a commanding market-share lead.  Among the eleven major chipset companies, nine have been forced out of the chipset market since 2008.  And although the size of the overall modem chipset market has doubled since 2008, there has not been a single new meaningful entrant into the market.  By 2015, Qualcomm accounted for nearly 60% of all mobile chipset sales worldwide, and nearly all third-party chipset sales for top-tier smartphones such as Apple's iPhone.  Qualcomm's policy of refusing to license to competitors fulfilled its purpose of squeezing out rivals and more than doubled the Company's revenues, from $11.1 billion in 2008 to $25.3 billion in 2015—far beyond that of any remaining competitor.  Changes in licensing policies that force competitor chipmakers to exit the market—and lead to billions of dollars in increased revenues—do not occur without the direction and approval of a Company's top executives.

196.   *Sixteenth*, Qualcomm insisted that its contractual counterparties accept "gag orders" and "no challenge" provisions in its agreements to shield the Company's anti-competitive practices from public scrutiny.  As set forth in the second paragraph of Section 7 of Apple and Qualcomm's 2013 Business Cooperation and Patent

Agreement, Qualcomm conditioned royalty relief on Apple's agreement not to initiate or induce a regulatory action against Qualcomm, including for "claims that Qualcomm failed to offer a license to its SEPs on FRAND terms."  Invoking this "gag provision," Qualcomm recently retaliated against Apple for providing information to the KFTC by withholding over $1 billion in royalty rebates.  In addition to Apple, Qualcomm inserted "gag provisions" and "no challenge" clauses in its agreements with other industry participants.  For example, Blackberry's former Executive Vice President of Products (*see* paragraph 185) has confirmed that Qualcomm's license agreement with Blackberry also contained a no- challenge clause. Qualcomm has also insisted that the terms of its agreements are "confidential" and thus cannot be shared. Qualcomm's insistence on contractual terms with the express purpose of silencing counterparties from reporting to authorities is yet further evidence of scienter.

197.  *Finally*, the Executive Officers were financially motivated to conceal the Company's actual licensing model.  As a product of Qualcomm's anti-competitive conduct, the six Executive Officers collectively received nearly $400 million in compensation during the Relevant Period, which was heavily weighted on stock awards and other incentive compensation.  For example, Aberle earned about $720,000 to $890,000 in annual salary, yet he received annual stock awards and other incentive compensation totaling over $62 million during the Relevant Period. Mollenkopf similarly earned between $805,000 and $1.1 million in annual salary, yet

he received annual stock awards and other incentive plan compensation totaling nearly $105 million during the Relevant Period.

198.   The Executive Officers also capitalized on their materially false and misleading statements and omissions to investors by disposing of personally-held shares at artificially inflated prices.  During the Relevant Period, Jacobs collected over $155 million from sales of his personal Qualcomm holdings; Altman collected over $74 million from sales of his personal Qualcomm holdings; Aberle collected nearly $50 million from sales of his personal Qualcomm holdings; Mollenkopf collected over $45 million from sales of his personal Qualcomm holdings; and Rosenberg collected over $40 million from sales of his personal Qualcomm holdings. In total, the Executive Officers sold over $365 million of their personally-held Qualcomm shares during the Relevant Period at artificially inflated prices.  Thus, the Executive Officers were strongly incentivized to develop and maintain practices that ensured Qualcomm's market dominance and artificially drove up the price of Qualcomm shares.

199.   The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of Qualcomm's scienter.

**VIII. LOSS CAUSATION**

200.   The conduct alleged herein, and the materially false and misleading statements and omissions made before or during the Relevant Period caused

116

Qualcomm's common stock to trade at artificially inflated prices, trading as high as $81.97 per share on July 23, 2014. Prior to the revelation of the truth through a series of partial corrective disclosures, the market believed Qualcomm's statements to investors.  For example, on August 14, 2014, one analyst, based on Qualcomm's misrepresentations and material omissions, stated, "[w]e do not believe that QCOM bundles chip-sales with patent deals," and, "[w]e do not believe QCOM prohibits [licenses to its competitors]."[73]

201.   As the truth about Qualcomm's discriminatory and unfair licensing model was revealed to the market through a series of disclosures beginning in November 2015, and the market learned the true basis for the Company's extraordinary financial performance during the Relevant Period as well as the substantial regulatory actions and litigation facing the Company, the artificial inflation was removed from the Company's stock price and the price of Qualcomm common shares declined significantly.

202.   On November 17, 2015, after the close of trading, Qualcomm issued a press release disclosing that it had recently received the KFTC Case Examiner's Report, which stated that Qualcomm suppressed market competition by excluding competitors.  As described by Qualcomm, the Case Examiner stated that Qualcomm's

---

[73] BMO Capital Markets, "More Detail on China IPR Issues" (Aug. 14, 2014), at 2.

patent practices violate the competition laws and found that Qualcomm "do[es] not properly negotiate aspects of [its] licenses." Qualcomm further stated that the Case Examiner's Report "proposes remedies," including modifying the Company's business practices and paying a substantial fine.

203.   In response to the November 17, 2015 revelations, Qualcomm shares declined significantly from a closing price of $49.69 per share on November 17, 2015, to close at $45.02 per share on November 18, 2015, on high volume, erasing nearly $7.5 billion in market capitalization.  A total of more than 45 million shares of Qualcomm common stock traded hands that day, an increase of 323% above trading volume in the prior session, as shown below.

**QCOM Closing Price and Volume, November 11-18, 2015**



204.   The financial press attributed the stock price decline on November 18 to the disclosure of the KFTC Case Examiner's Report, with *Market Watch*, for example, reporting that "[s]hares of Qualcomm Inc. sank … to their 52-week low Wednesday after the chipmaker announced that it faces patent-related antitrust allegations in South Korea."[74]

205.   In its press release issued on November 17, 2015, Qualcomm criticized the Case Examiner's Report, asserting that the Case Examiner's findings were "not supported by the facts" and claimed that Qualcomm's "patent licensing practices ... have facilitated the growth of the mobile communications industry in Korea and elsewhere [and were] lawful and pro-competitive."[75]

206.   Three weeks later, on December 8, 2015, the European Commission announced that it had charged Qualcomm with illegal anti-competitive practices, including paying a major customer to use Qualcomm chips exclusively.   The European Commission preliminarily concluded that Qualcomm violated EU antitrust laws by paying a major customer, later identified as Apple, to exclusively use its

---

[74] S. Chang, Market Watch, "Qualcomm sinks to 52-week low after allegations of antitrust violations in Korea" (Nov. 18, 2015); *see also* The Wall Street Journal, "Qualcomm Says South Korea Recommends Fine for Alleged Antitrust Violations" (Nov. 18, 2015) ("Qualcomm's shares were down nearly 9% on the news [of the KFTC report] Wednesday.").

[75] Press Release, "Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report" (Nov. 17, 2015).

chipsets, as a way of forcing competitor chipmakers out of the market. On the same day, the Taiwan FTC announced that it was initiating an investigation into Qualcomm's licensing arrangements.  The Taiwan FTC asserted that Qualcomm's patent licensing practices violated the Taiwan Fair Trade Act, specifically, "by declining to grant licenses to chipset makers" and providing "royalty rebates to certain companies in exchange for their exclusive use of the Company's chipsets." These assertions were corroborated by, among other things, the KFTC's findings, and later revelations.

207.   In response to these disclosures on December 8, 2015, Qualcomm shares declined significantly from a closing price of $52.43 per share on December 7, 2015, to close at $49.48 per share on December 8, 2015, erasing nearly $4.5 billion in market capitalization. A total of nearly 19 million shares of Qualcomm common stock were sold on December 8, 2015, an increase of 86% above trading volume in the prior session.

208.   Despite the disclosures of the KFTC Case Examiner's Report and the charges levied by the European Commission and the Taiwan FTC, the full extent of Qualcomm's anti-competitive practices still had not been revealed to the market, and Qualcomm continued to issue public assurances and denials. For example, on December 8, 2015, a *New York Times* article quoted Rosenberg, who stated that the Company "look[ed] forward to demonstrating that competition in the sale of wireless

chips has been and remains strong," even though the Company knew at that time that it had been engaging in pervasive anti-competitive practices— including the refusal to license competitors and tying the terms of its license agreements and chipset sales—and that its actions had harmed competition in the chipset market.

209.    Similarly, in late 2015, Qualcomm told analysts that among the unique strategic benefits of its decision to keep QCT and QTL together was that such a "[p]ro-competitive model benefits [the] wireless industry and consumers."[76] Mollenkopf also described Qualcomm as "an important enabler to the wireless industry, acting as a strong partner to carriers, OEMs and software application providers, and is a key supporter of the dynamic and competitive wireless industry."[77] In June 2016, Rosenberg continued to falsely assure the market, telling reporters, "We believe that our licensing practices are fair and they are good not just for Qualcomm, but for the entire industry."[78]

---

[76] Presentation, "Qualcomm Completes Review of Corporate and Financial Structure" slide 5 (Dec. 15, 2015); *see also* Wells Fargo Securities, Equity Research: Qualcomm Inc. (Dec. 15, 2015), at 2; Cowen and Company, "US FTC Decides to Sue: Our Take" (Jan. 17, 2017), at 2 ("In deciding in late 2015 to keep QTL and QCT together, the company cited, among other things, the view that a split would not help alleviate legal concerns, thus implying that 'bundling' was not part of the existential value of QCOM – as this complaint asserts.").

[77] Transcript, "Qualcomm Inc. Review of Corporate Completes and Financial Structure" (Dec. 15, 2015).

[78] L. Wang, Taipei Times, "Qualcomm defends licensing fees" (June 24, 2016).

210.   On December 27, 2016, the KFTC issued a press release announcing that its two-year investigation into Qualcomm had culminated in findings that the Company had abused its market dominance.[79]  Specifically, the press release revealed that Qualcomm had violated its FRAND commitments and Korean antitrust law by, among other things, refusing to license its cellular standards-essential patents.  The press release also announced that the KFTC levied an $853 million fine on the Company for these violations.

211.   In response to the December 27, 2016 disclosure, Qualcomm shares declined from a closing price of $67.25 per share on December 27, 2016, to close at $65.75 per share on December 28, 2016, erasing over $2.2 billion in market capitalization.

212.   Media reports directly linked the December 29, 2016 decline in Qualcomm's share price to the decision issued by the KFTC.[80]  *Barron's* reported that "[s]hares of wireless chip giant Qualcomm (QCOM) are down 89 cents, or 1.3%, at $66.36, after South Korea's Fair Trade Commission said an investigation into the

---

[79] Korea Fair Trade Commission, Anti-Monopoly Bureau, Anti-Monopoly Division, Press Release: "Strict Sanctions on Qualcomm's Abuse of Cellular SEPs."  (Dec. 28, 2016).  The statement was released on December 28 in South Korea, although it was still December 27 in the United States.

[80] *See, e.g.*, E. Carson, Investor's Business Daily, "Qualcomm Falls As South Korea Fine Puts Royalties In Doubt" (Dec. 28, 2016); J. Francis, "Qualcomm Receives $854 Million Antitrust Fine In Korea" (Dec. 30, 2016).

company found some of its 'business practices are in violation of Korean competition law,' and that the commission plans to 'impose an administrative fine of approximately 1.03 trillion South Korean Won (approximately $865 million at current exchange rates).'"[81]   In an analyst report published two days later, on December 29, 2016, analysts at Trefis noted that the decision could alter "the way the company conducts business" and "have far greater implications for Qualcomm than the fine itself."[82]

213.   Nevertheless, Qualcomm continued to deny that it had engaged in anti-competitive behavior, stating in a press release dated December 27, 2016, that it "believes [the KFTC's decision] is inconsistent with the facts and the law," and that Qualcomm had "fostered competition at all levels of the mobile ecosystem" worldwide.[83]

214.   On January 17, 2017, during market hours, media reports began to circulate that the FTC had commenced an antitrust enforcement action against

---

[81] T. Ray, "Tech Today: Nvidia Warnings, OLED Trimmed, Qualcomm Fined" (Dec. 28, 2016).

[82] Trefis, "Qualcomm: What Does The KFTC Ruling Imply For Qualcomm?" (Dec. 29, 2016), at 1.

[83] Press Release, "Qualcomm Responds to Announcement by Korea Fair Trade Commission" (Dec. 27, 2016).

Qualcomm for "using unfair practices in the way it licenses its technology."[84]  That same day, following an over two-year investigation, the FTC filed its complaint against Qualcomm in the Northern District of California.[85]  The complaint contained startling revelations, including that: (1) despite its commitment to license standard-essential patents on FRAND terms, "Qualcomm has consistently refused to license those patents to competing suppliers of chipsets"; and (2) Qualcomm precluded Apple from sourcing chipsets from Qualcomm's competitors from 2011 to 2016.  As set forth in the FTC complaint, "Qualcomm recognized that any competitor that won Apple's business would become stronger and used exclusivity to prevent Apple from working with and improving the effectiveness of Qualcomm's competitors."[86]

215.   In response to the disclosures in the FTC complaint, Qualcomm shares declined significantly from a closing price of $66.88 per share on January 13, 2017, to close at $64.19 per share on January 17, 2017, erasing nearly $4 billion in market capitalization. A total of 22 million shares of Qualcomm common stock traded hands on January 17, 2017, an increase of 261% above trading volume in the prior session.

---

[84] *See, e.g.*, I. King, Bloomberg Technology, "Qualcomm Said to Face U.S. Antitrust Case Over Licensing" (Jan 17, 2017).

[85] FTC Complaint, No. 5:17-cv-00220-LHK (N.D. Cal. Jan. 17, 2017), ECF No. 1.

[86] FTC Press Release, "FTC Charges Qualcomm With Monopolizing Key Semiconductor Device Used in Cell Phones" (Jan. 17, 2017).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

216.   Media reports directly linked the foregoing decline in Qualcomm's share price to the FTC suit.[87]   *Business Insider* reported that "Qualcomm's stock dropped as much as 4% on Tuesday after the FTC filed an anti-trust complaint against the company," and that the "initial drop came when Bloomberg reported the FTC was planning to file the complaint against Qualcomm."[88]   In a research report released on January 18, 2017, Morgan Stanley noted that "[w]hile the market has known since 2014 that the FTC was investigating Qualcomm, yesterday's announced antitrust lawsuit still comes as a surprise."[89]

217.   On January 17, 2017, Qualcomm emphatically denied the charges levied by the FTC complaint, insisting that "[t]he portrayal of facts offered by the FTC as the basis for the agency's case is significantly flawed."[90]   In particular, the

---

[87] *See, e.g.*, A. Palmer, TheStreet.com, "The FTC Rocks Qualcomm" (Jan. 17, 2017) ("The news [of the FTC's allegations] sent Qualcomm shares sharply lower by 4% to $64.19 on Tuesday on fears of damage to its lucrative business model."); W. Witkowski, Market Watch, "Qualcomm shares close 4% lower on FTC monopoly complaint" (Jan. 17, 2017).

[88] S. Kovach, Business Insider, "Qualcomm's Stock Falls After Report Says Company Faces US Anti-trust Case" (Jan. 17, 2017).

[89] Morgan Stanley, "Qualcomm Inc.: FTC Move Unexpected; We See Several Uncertainties" (Jan. 18, 2017).

[90] Press Release, "Qualcomm Responds to Complaint from U.S. Federal Trade Commission" (Jan. 17, 2017).

Company stated that it "ha[d] never withheld or threatened to withhold chip supply in order to obtain agreement to unfair or unreasonable licensing terms."[91]

218. Qualcomm further asserted that its business practices "ha[d] enabled the growth and advancement of mobile communications worldwide," and that the Company had engaged in "broad-based licensing of [standards-essential patent] technologies on fair, reasonable and non-discriminatory terms."[92]

219. In the last hour of trading, on January 20, 2017, it was disclosed that Qualcomm's largest customer, Apple, filed a lawsuit against Qualcomm in the Northern District of California asserting that the Company used its monopoly position to seek onerous, unreasonable, and costly terms for its technology licenses.[93] The complaint specifically stated that Qualcomm had blocked Apple's ability to choose suppliers for chipsets by refusing to license to competitors and conditioning billions of dollars of rebates on Apple's exclusive use of Qualcomm chipsets. The complaint also explained that Qualcomm had attempted to extort Apple into rescinding its truthful testimony to Korean antitrust authorities by withholding contractual royalty rebate payments due to Apple.

---

[91] *Id.*

[92] Press Release, "Qualcomm Responds to Complaint from U.S. Federal Trade Commission" (Jan. 17, 2017).

[93] Apple Complaint, No. 3:17-cv-00108-GPC-MDD (N.D. Cal. Jan. 20, 2017), ECF No. 1.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

220. In response to these disclosures, Qualcomm shares declined significantly from a closing price of $64.44 per share on Thursday, January 19, 2017, to close at $62.88 per share on Friday, January 20, 2017, erasing over $2.3 billion in market capitalization on high volume of nearly 21 million shares. The financial press attributed the foregoing decline in Qualcomm's share price to Apple's complaint.[94] In an analyst report released on January 22, 2017, Cowen and Company noted that the allegations in Apple's complaint, if successful, "could result in spread to other manufacturers.... [T]he largest impact will come from how these lawsuits impact [the Company's] future licensing fee model."[95]

221. On the next trading day, January 23, 2017, Qualcomm shares declined further to $54.88 per share, erasing an additional $11.8 billion in market capitalization, on high volume of more than 94 million shares, as the market continued to digest the statements in Apple's disclosure following the intervening weekend. Business *Insider* noted that "Qualcomm plunge[d] 12% on word of Apple's $1 billion lawsuit."[96]

---

[94] *See, e.g.*, D. Bartz & S. Nellis, Reuters, "Apple files $1 billion lawsuit against chip supplier Qualcomm" (Jan. 20, 2017) ("Qualcomm's stock closed 2.4 percent lower at $62.88 on the news [of Apple's allegations]."); CNN, "Apple sues Qualcomm for nearly $1 billion" (Jan. 20, 2017).

[95] Cowen and Company, "Qualcomm: Thinking Through This AAPL Lawsuit" (Jan. 22, 2017).

[96] Wadhwa, *Business Insider*, "Qualcomm plunges 12% on word of Apple's $1 billion lawsuit" (Jan. 23, 2017); *see also* D. Blakenhorn, InvestorPlace, "The Pain Is Only the Beginning for Qualcomm, Inc. (QCOM) Stock" (Jan. 23, 2017).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

222.   The chart below shows the value after trading closed on January 23, 2017, of a theoretical $100 investment in Qualcomm made at the closing price of Qualcomm common stock on January 13, 2017, as compared with value of a $100 investment in the S&P Semiconductor Select Industry Index made at the same time. The S&P Semiconductor Select Industry Index (ticker symbol: ^SPSISC) comprises all stocks in the S&P Total Market Index that are classified in the GICS semiconductor sub-industry, which includes Qualcomm. While Qualcomm's share price declined by nearly 18% during this period, the index was down less than 1%.

**QCOM Share Price versus Semiconductor Industry Index, January 13-23,2017**



223.   The declines in the price of Qualcomm common stock identified above directly resulted from or were substantially caused by the market learning the truth about Qualcomm's discriminatory and unfair licensing and chipset sale practices, the true basis for the Company's financial performance during the Relevant Period, and the substantial risks facing Qualcomm and a result of its undisclosed practices— including, specifically, its refusal to license competitors and its bundling of licensing agreements with chipset sales and negotiations.  The timing and magnitude of the price declines negate any inference that the losses suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendant's misrepresentations and omissions.

224.   Moreover, each announcement of a government investigation or filing of a formal proceeding concerning the Company's undisclosed, anti-competitive practices was followed by a subsequent confirmatory disclosure. Just over one year after the bombshell revelations contained in the KFTC Case Examiner's Report, the KFTC announced that its comprehensive investigation had culminated in extensive findings that Qualcomm had abused its market dominance and that it had issued a record fine on Qualcomm of nearly $1 billion. Only months later, Apple, Intel and Samsung each publicly filed documents confirming their "firsthand" experience with Qualcomm's anti-competitive practices.

225.   Accordingly, as a result of its purchases of Qualcomm common stock during the Relevant Period, Plaintiff suffered economic loss and damages under the federal securities laws.

## IX.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

226.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Qualcomm's current and historical patent licensing and chip-sale practices, its present licensing and sales practices, and its financial condition, among other topics.

227.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendant's statements regarding its patent licensing and chipset sales practices, and compliance with relevant standards, among others. Given the then-existing facts contradicting Defendant's statements, any generalized

risk disclosures made by it were not sufficient to insulate it from liability for its materially false and misleading statements.

228.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendant is liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Qualcomm who knew that the statement was false when made.

## X.   PRESUMPTION OF RELIANCE

229.   At all relevant times, the market for Qualcomm's common stock was efficient for the following reasons, among others:

(a)   Qualcomm's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stock Market, a highly efficient and automated market;

(b)   As a regulated issuer, Qualcomm filed periodic reports with the SEC and the NASDAQ Stock Market;

(c)   Qualcomm regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide- ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Qualcomm was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

230.   As a result of the foregoing, the market for Qualcomm's common stock reasonably promptly digested current information regarding Qualcomm from all publicly available sources and reflected such information in the price of Qualcomm's common stock.

231.   A presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendant are predicated upon omissions of material fact for which there is a duty to disclose.

## XI.   CLAIM FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

#### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder

232.   Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

233.   This Count is asserted against Qualcomm for violations of Section 10(b) of the Exchange Act,15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

234.   During the Relevant Period, Defendant disseminated or approved the false statements specified above, which it knew were, or it deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

235.   Defendant violated Section 10(b) of the Exchange Act and Rule 10b-5 in that it: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff in connection with its purchases of Qualcomm common stock during the Relevant Period.

236.   Defendant, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiff; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with deliberate recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Qualcomm common stock, which were intended to, and did(a) deceive the investing public, including Plaintiff, regarding, among other things, Qualcomm's patent licensing and chip-sales practices, and the Company's compliance with relevant competition laws and

regulations and worldwide patent licensing standards; (b) artificially inflate and maintain the market price of Qualcomm common stock; and (c) cause Plaintiff to purchase Qualcomm common stock at artificially inflated prices and suffer losses when the true facts became known.

237.   Defendant is liable for all materially false and misleading statements made during the Relevant Period, as alleged above.

238.   As described above, Defendant acted with scienter throughout the Relevant Period, in that it acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Qualcomm stock, were either known to Defendant or were so obvious that the Defendant should have been aware of them.

239.   Plaintiff has suffered damages in that, in direct reliance upon the misrepresentations and/or in reliance on the integrity of the market, it paid artificially inflated prices for Qualcomm common stock, which inflation was removed from its price when the true facts became known.  Plaintiff would not have purchased Qualcomm common stock at the prices it paid, or at all, if it had been aware that the market price had been artificially and falsely inflated by Defendant's materially misleading statements.

240.  As a direct and proximate result of these Defendant's wrongful conduct, Plaintiff suffered damages attributable to the material misstatements and omissions alleged herein in connection with its purchases of Qualcomm common stock during the Relevant Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for relief and judgment as follows:

(a)   Awarding all damages and other remedies available under the Securities Exchange Act in favor of Plaintiff against Defendant in an amount to be proven at trial, including interest thereon;

(b)   Awarding Plaintiff its reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(c)   Such other and further relief as the Court may deem just and proper.

## XIII.  JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  March 2, 2018                    Respectfully submitted,


                                        KIRBY MCINERNEY LLP

                                        By: */s/ Robert J. Gralewski, Jr.*
                                        Robert J. Gralewski, Jr.
                                        bgralewski@kmllp.com
                                        600 B Street, Suite 1900
                                        San Diego, CA 92101
                                        Tel:   (619) 398-4340

1

2

3     -and-

4     Daniel Hume
      dhume@kmllp.com
5     Ira Press
      ipress@kmllp.com
6     Christopher S. Studebaker
      cstudebaker@kmllp.com
7     825 Third Avenue
      New York, NY 10022
8     Tel:   (212) 371-6600
      Fax:   (212) 751-2540
9     *Counsel for Plaintiff GIC Private Limited*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 2, 2018, the foregoing document was filed with the Clerk of the Court using the CM/ECF system, pursuant to the Court's Electronic Case Filing Administrative Policies and Procedures Manual.

Counsel of record who are deemed to have consented to electronic service will be sent notice of this filing by operation of the Court's electronic filing system, and parties may access this filing through the Court's CM/ECF System.

The undersigned further certifies that a true and correct copy of the foregoing document will be served on all other parties and counsel pursuant to Federal Rules of Civil Procedure 4 and 5, and Local Rule 4.1.

Executed on March 2, 2018, at San Diego, California.

<div align="center">

*/s/ Robert J. Gralewski, Jr.*

Robert J. Gralewski, Jr.

</div>